# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 19, 2013

Decided June 7, 2013
Reissued June 14, 2013

No. 12-1171

SUBURBAN AIR FREIGHT, INC.,
PETITIONER

v.

TRANSPORTATION SECURITY ADMINISTRATION,
RESPONDENT

---

On Petition for Review of an Order
of the Transportation Security Administration

---

*Robert E. O'Connor Jr.* argued the cause and filed the briefs for petitioner.

*Sharon Swingle*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, and *Mark B. Stern* and *Dana L. Kaersvang*, Attorneys.

Before: HENDERSON, ROGERS, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Petitioner Suburban Air Freight, a Federal Aviation Administration–certified air carrier, operates pursuant to a Transportation Security Administration–approved security plan. After observing the loading of a Suburban aircraft, TSA inspectors determined that Suburban had failed to adequately implement security measures mandated by its plan. An administrative law judge agreed and imposed an $18,000 fine, which the TSA Administrator upheld. Finding no error, we deny Suburban's petition for review.

## I.

Congress endowed TSA with authority to promulgate regulations to promote transportation security. *See* 49 U.S.C. § 114(*l*)(1). With respect to aviation security, TSA has established different sets of rules for different kinds of aircraft operators. This case involves the rules that govern "twelve-five" operations—that is, operations that (1) are not regulated under another TSA program, (2) utilize an airplane weighing more than 12,500 pounds, (3) run scheduled or charter service, and (4) carry passengers and/or cargo. *See* 49 C.F.R. § 1544.101(d). TSA requires twelve-five operators to "ensure that cargo is screened and inspected for any unauthorized person, and any unauthorized explosive, incendiary, and other destructive substance or item." *Id.* § 1544.205(b). Although operators are given some flexibility to determine precisely how they will meet their security obligations, they must submit a proposed security program—known as a "Twelve-Five Standard Security Program" or a "TFSSP"—to TSA for approval. *Id.* § 1544.105(a). TSA offers a standard-form TFSSP that operators may modify with TSA's consent. *See Aviation Security: Private Charter Security Rules*, 67 Fed. Reg. 79,881, 79,884 (Dec. 31, 2002) (explaining that "TSA developed a standard security program and forwarded it to affected entities" and that "TSA may approve [proposed] changes" thereto). Operators must abide by their approved

TFSSP until and unless TSA approves an amendment. *See id.* § 1544.105(b).

Petitioner Suburban Air Freight operates pursuant to an approved TFSSP. Two provisions of that document are relevant here: Section 6.2, which provides that "[b]efore any crewmember is authorized to board his or her assigned aircraft, a direct twelve-five aircraft operator employee or authorized representative must request and verify a government-issued photo ID of each crewmember and his or her assignment on that flight," and Section 8.1, which states that operators of all-cargo flights "must maintain direct custody and control of cargo." Prior to the events at issue in this case, TSA had been in contact with Suburban about its compliance with these requirements.

On October 6, 2009, a TSA inspector visited Richmond International Airport and observed the loading of a Suburban flight transporting packages for DHL International Express, an "Indirect Air Carrier" with its own TSA-approved security plan. The flight was a "single pilot" operation, meaning that the pilot was the only crew member. The cargo-loading area at the Richmond Airport is inside the airport's secured area, which only individuals with airport-issued IDs and their guests may enter. Because the DHL employees delivering packages to Suburban had airport-issued badges but the Suburban pilot did not, DHL employees escorted the pilot into the secured area. In the pilot's presence, the DHL employees then proceeded to load the packages onto the plane.

The TSA inspector was not satisfied. He observed that no Suburban employee or authorized representative ever checked the pilot's identification. Instead, the pilot indicated that he had "verified his own ID." The inspector also noted that the pilot failed to keep a constant watch on the loading process— at times even standing with his back to the aircraft—and then failed to inspect the cargo after loading was complete.

As a result, TSA charged Suburban with violating the ID-check and custody-and-control provisions of its TFSSP. Suburban disputed both alleged violations. Alternatively, it argued that the October 6 flight did not qualify as a twelve-five operation and was therefore not subject to the TFSSP's requirements because the flight carried no "cargo" within the meaning of the regulations. After a hearing, an administrative law judge found that the TFSSP applied and that Suburban had in fact committed both alleged violations. Accordingly, he imposed an $18,000 fine. Suburban filed an intra-agency appeal, and a TSA Administrator affirmed the ALJ's decision in all respects.

In its petition for review, Suburban raises three arguments. First, Suburban challenges the Administrator's determination that the October 6 flight was carrying "cargo" and, as a result, that the TFSSP applied. Second, even if the TFSSP were applicable, Suburban argues that the Administrator erroneously interpreted and applied the two sections of the TFSSP the company was charged with violating. And third, even if the Administrator's interpretation of the TFSSP would otherwise have been reasonable, Suburban maintains that it lacked fair notice that its TFSSP would be so interpreted.

## II.

Pursuant to the Administrative Procedure Act, we must uphold TSA's decisions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or unsupported by "substantial evidence." 5 U.S.C. § 706(2); 49 U.S.C. § 46110(c); *see Alaska Airlines, Inc. v. TSA*, 588 F.3d 1116, 1120 (D.C. Cir. 2009). In addition, "[w]e must give substantial deference to [the] agency's interpretation of its own regulations." *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512 (1994). Both parties

appear to assume that we should afford similar deference to TSA's interpretation of the TFSSP, and we agree. Although this seems to be the first time the question of deference has arisen in the TFSSP context, we believe TFSSPs are analogous to other formal, standardized, agency-approved documents with respect to which we afford agencies deference. Just as we defer to the Federal Energy Regulatory Commission's and the Federal Communications Commission's interpretations of tariffs, *see e.g.*, *FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 446 (D.C. Cir. 2005) (FERC); *Global NAPs, Inc. v. FCC*, 247 F.3d 252, 258 (D.C. Cir. 2001) (FCC), for example, so too must we defer to TSA's reasonable interpretation of a TFSSP.

## A.

Suburban's first argument—that the TFSSP did not apply to the October 6 flight—hinges on the proposition that the DHL packages Suburban was transporting were unaccompanied by an air waybill. Suburban's logic is straightforward. The TFSSP governs only twelve-five operations; to qualify as a twelve-five operation, an aircraft must carry "passengers or cargo or both," 49 C.F.R § 1544.101(d); and "cargo" is defined as "property tendered for air transportation accounted for on an air waybill," *id.* § 1540.5. Working backwards through the links in this chain, Suburban maintains that if there was no air waybill for the DHL packages, then those packages did not qualify as cargo, the October 6 flight was not a twelve-five operation, and the TFSSP did not apply. As Suburban repeatedly puts it, "no air waybill, no cargo, no TFSSP violation." Petitioner's Br. 37.

TSA accepted Suburban's reasoning but rejected its premise, concluding that the DHL packages *were* in fact "accounted for on an air waybill." 49 C.F.R. § 1540.5. This conclusion was supported by substantial evidence: TSA inspectors testified that the packages DHL ships with

Suburban are accounted for on air waybills, a DHL email explained that "DHL uses air waybills for every shipment," and TSA introduced one of DHL's "master" air waybills into evidence. This evidence makes clear that DHL's shipments, including its shipments with Suburban, are always accounted for on air waybills, and Suburban made no showing that it deviated from this practice on the October 6 flight. Accordingly, although Suburban is right that TSA never produced the specific air waybill for that flight, the absence of this document from the record fails to negate the substantial evidence showing that such a document existed. This is especially true given that Suburban failed to raise its "no air waybill" defense until shortly before the hearing. Suburban also attempts to undermine the Administrator's conclusion by pointing to her mischaracterization of a bit of testimony as coming from a DHL representative rather than a TSA inspector, but any such mistake was plainly harmless given the clear import of the evidence. *See* 5 U.S.C. § 706 (providing that "rule of prejudicial error" applies to review of agency decisions).

**B.**

Suburban next argues that even if the TFSSP governed the October 6 flight, TSA arbitrarily and capriciously interpreted and applied the two TFSSP provisions it claims Suburban violated. Recall that the first of these, Section 6.2, provides that, "[b]efore any crewmember is authorized to board his or her assigned aircraft, a direct twelve-five aircraft operator employee or authorized representative must request and verify a government-issued photo ID of each crewmember and his or her assignment on that flight." Flying into the headwinds of this broad language, Suburban argues that the ID-check requirement simply does not extend to single-pilot operations. Relying on the TFSSP's repeated references to "crewmember," Suburban insists that "crew" cannot refer to a single person. Moreover, it maintains that

TSA's could not have intended the ID-check requirement to cover single-pilot operations because compliance is effectively impossible where, as in this case, there is no other crewmember present to perform the check.

This argument won't fly. TSA's interpretation of "crew" to include crews of one is reasonable. Indeed, Suburban's own TFSSP defines "crewmember" as "[a] person assigned to perform duty in an aircraft during flight time," and pilots, whose duty it is to fly the plane, certainly meet that definition regardless of whether they are flying solo. And far from impossible, compliance with the ID-check requirement on single-pilot operations, as TSA points out, could be achieved at Richmond Airport through designation of an authorized representative. Here, as TSA again points out, Suburban could have designated DHL as its representative, and DHL employees could then have checked the pilot's ID and flight assignment before he boarded the plane. To the extent Suburban maintains this requirement would be impractical at other, more remote airports, it may submit a request to TSA to amend its TFSSP. *See* 49 C.F.R. § 1544.105(b). Although permitting a pilot to "verif[y] his own ID," as this one purported to do, would doubtless be more convenient, to repeat that suggestion is in essence to refute it. It is TSA's job—not Suburban's or ours—to strike a balance between convenience and security, and a meaningful ID check, as opposed to a self-administered one, serves as an important element of the security regime TSA has devised.

The second TFSSP provision TSA found Suburban to have violated, Section 8.1, requires an "all-cargo twelve-five aircraft operator [to] maintain direct custody and control of cargo . . . from the time of acceptance until transferred to," among other entities, an Indirect Air Carrier like DHL. Section 8.1 further specifies that "twelve-five aircraft operator employees and authorized representatives are the only individuals authorized to maintain custody and control of

cargo." Despite this language, Suburban maintains that it should have sufficed that DHL employees maintained custody of the cargo while loading it on the plane, regardless of whether the pilot adequately supervised them. Acknowledging that the DHL employees were neither Suburban employees nor its authorized representatives, Suburban emphasizes that they were bound by DHL's own security agreement with TSA and had extensively screened the packages prior to delivering them.

Again, the standard of review disposes of this argument. The TFSSP could hardly have been more clear—Suburban "employees and authorized representatives are the *only* individuals authorized to maintain custody and control of cargo" (emphasis added)—and the pilot was the only such individual on hand while the DHL packages were loaded onto the plane. Because the evidence shows that the pilot failed to watch the DHL employees at all times or inspect the cargo after it was loaded, the Administrator reasonably concluded that Suburban violated Section 8.1. True, requiring the pilot to supervise the DHL employees may be somewhat redundant given that DHL had already screened the cargo. But TSA emphasizes that redundancy plays an important role in aviation security. Suburban has no authority to deviate from the obligations set out in its TFSSP merely because it believes them superfluous.

## C.

Finally, Suburban contends that even if the TFSSP applied and even if the Administrator's interpretations of Sections 6.2 and 8.1 were reasonable, Suburban's due process rights were violated because it lacked fair notice of those interpretations. The "fair notice doctrine," which began as a principle of due process in the criminal context and "has now been thoroughly 'incorporated into administrative law,' " *General Electric Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir.

1995) (quoting *Satellite Broadcasting Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987)), "prevents . . . deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires," *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986).

This case, however, has nothing in common with the very limited set of cases in which we have upheld an agency interpretation but nevertheless vacated an enforcement action on notice grounds. For one thing, the TFSSP made clear that Suburban was required to have someone other than the pilot check the pilot's ID and to have an employee or authorized representative maintain custody and control of the cargo. *Cf. General Electric*, 53 F.3d at 1330 (lack of fair notice where agency's "interpretation [was] so far from a reasonable person's understanding of the regulations that they could not have fairly informed [regulated parties] of the agency's perspective"). Moreover, Suburban makes no argument that TSA previously interpreted those provisions differently, let alone that the company relied on any such interpretation. *Cf. FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317–18 (2012) (lack of fair notice where agency "changed course" with respect to its interpretation of a governing statute); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167–68 (2012) ("potential for unfair surprise is acute" where agency failed to "suggest[ ] that it thought the industry was acting unlawfully"). Indeed, Suburban signed on to the TFSSP, discussed the issues that arose in this case with TSA inspectors prior to the October 6 inspection, and had an opportunity to press its position in an adversarial hearing. Neither the Constitution nor administrative law fair-notice principles require anything more.

**III.**

For the foregoing reasons, we deny the petition for review.

*So ordered.*