# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 2, 2022         Decided July 15, 2022

No. 21-1170

ROHAN RAMSINGH,
PETITIONER

v.

TRANSPORTATION SECURITY ADMINISTRATION,
RESPONDENT

———

On Petition for Review of an Order of the
Transportation Security Administration

———

*Jonathan Corbett* argued the cause and filed the briefs for petitioner.

*Kyle T. Edwards*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Brian M. Boynton*, Acting Assistant Attorney General at the time the brief was filed, and *Sharon Swingle*, Attorney.

Before: ROGERS, MILLETT, and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Shortly before Thanksgiving 2019, Rohan Ramsingh, an Army veteran, arrived at the Tampa

International Airport to pick up two of his children who were visiting for the holiday. After a swab of Ramsingh's hands tested positive for traces of explosive material, screening personnel from the Transportation Security Administration attempted to perform a full-body pat-down. Citing medical reasons, Ramsingh repeatedly refused to be patted down and was subsequently escorted away from the checkpoint by law enforcement.

The agency assessed Ramsingh a civil penalty for "interfer[ing] with * * * screening personnel in the performance of their screening duties[.]" 49 C.F.R. § 1540.109.

Ramsingh petitioned this court to overturn the penalty on the ground that his refusal to submit to a pat-down, particularly in light of his medical justifications, did not constitute interference under the regulation. Because, on the record in this case, the agency lawfully applied its interference regulation to Ramsingh's conduct, we deny the petition for review.

# I

## A

Congress has charged the Transportation Security Administration ("TSA") with "safeguard[ing] this country's civil aviation security and safety." *Corbett v. TSA*, 19 F.4th 478, 480 (D.C. Cir. 2021). The agency has "broad authority" to "identify 'threats to transportation' and take the appropriate steps to respond to those threats." *Id.* at 480, 486 (quoting 49 U.S.C. § 114(f)(2), (3)).

As relevant here, Congress directed the TSA to "provide for the screening of all passengers and property * * * that will

be carried aboard a passenger aircraft[.]" 49 U.S.C. § 44901(a). To that end, TSA promulgated a regulation stating that "[n]o individual may enter a sterile area or board an aircraft without submitting to the screening and inspection of his or her person and accessible property[.]" 49 C.F.R. § 1540.107(a). The "sterile area" is the "portion of an airport * * * that provides passengers access to boarding aircraft and to which the access generally is controlled by TSA[.]" *Id.* § 1540.5. Individuals and their property are inspected for, among other things, "weapons, explosives, and incendiaries." *Id.*

TSA regulations specify that "[n]o person may interfere with, assault, threaten, or intimidate screening personnel in the performance of their screening duties[.]" 49 C.F.R. § 1540.109. The aim of Section 1540.109 is to "prohibit[] interference that might distract or inhibit a screener from effectively performing his or her duties." Civil Aviation Security Rules, 67 Fed. Reg. 8,340, 8,344 (Feb. 22, 2002). TSA explained that "[t]his rule is necessary to emphasize the importance to safety and security of protecting screeners from undue distractions or attempts to intimidate." *Id.* "[A]busive, distracting behavior, and attempts to prevent screeners from performing required screening, are subject to civil penalties[.]" *Id.*[1]

**B**

To ensure that all individuals are fully screened before gaining access to the boarding area, TSA relies on a combination of walk-through metal detectors, Advanced Imaging Technology ("AIT") machines, explosive trace detection tests, and pat-downs. AIT machines can screen for

---

[1] Interference with security personnel that rises to the level of assault is also subject to criminal penalties under 49 U.S.C. § 46503.

both metallic and non-metallic threats, addressing "a critical weakness in aviation security" that existed when only metal detectors were used. Passenger Screening Using Advanced Imaging Technology, 81 Fed. Reg. 11,364, 11,365 (March 3, 2016). While AIT machines have become standard in airports across the United States, "[p]assengers generally may decline AIT screening and opt instead for a pat-down." *Id.*

Other circumstances in which a passenger may be required to undergo a pat-down include "if the screening technology alarms, as part of unpredictable security measures, [or] for enhanced screening[.]" *Security Screening*, TSA, https://www.tsa.gov/travel/security-screening (last accessed July 7, 2022) ("Pat-Down Screening" drop-down box). A pat-down "may include inspection of the head, neck, arms, torso, legs, and feet[,]" as well as "sensitive areas such as breasts, groin, and the buttocks." *Id.*

TSA provides limited screening accommodations for those with disabilities and medical conditions, but the agency emphasizes that persons with such conditions must also "undergo screening at the checkpoint." *Disabilities and Medical Conditions*, TSA, https://www.tsa.gov/travel/special-procedures (last accessed July 7, 2022).

TSA requires that once an individual has begun the screening process, he or she must complete it. *See* Appendix ("A.") 63–64, 86, 88, 205–206, 290, 296; *see also* 81 Fed. Reg. at 11,385. Individuals are not allowed to leave partway through. After all, permitting an individual "to revoke consent to an ongoing airport security search makes little sense in a post-9/11 world." *United States v. Aukai*, 497 F.3d 955, 960 (9th Cir. 2007) (en banc); *see* A. 296. Letting individuals self-select out of the process once faced with additional screening, in particular, "would afford terrorists multiple opportunities to

attempt to penetrate airport security by 'electing not to fly' on the cusp of detection until a vulnerable portal is found[,]" and would supply terrorists with a "low-cost method of detecting systematic vulnerabilities in airport security, knowledge that could be extremely valuable in planning future attacks." *Aukai*, 497 F.3d at 960–961 (footnote omitted).

## II

### A

On November 23, 2019, Ramsingh arrived at the Tampa International Airport, along with his girlfriend and child, to pick up Ramsingh's other two minor children who were arriving unaccompanied on a flight from Houston. After receiving gate passes from the airline, they entered the security checkpoint. When Ramsingh attempted to proceed through the walk-through metal detector, Transportation Security Officer Julio Melendez Ortiz instructed him to go through the AIT machine instead. Ramsingh stated that, due to a shoulder injury incurred during military service, he could not lift both arms above his head, as required by the AIT machine. Officer Melendez Ortiz then permitted Ramsingh to use the walk-through metal detector.

TSA procedures require that a traveler who declines AIT screening undergo an explosive trace detection test, so Officer Melendez Ortiz swabbed Ramsingh's hands. *See* A. 83 (TSA officer stating in an affidavit that "the passenger opted out of the AIT screening," so "his hands were [explosive trace detection tested] pursuant to policy"); A. 204 ("TSA Standard Operating Procedures * * * required that [Ramsingh] receive an Explosive Trace Detection * * * test on his hands."). The test came back positive for possible components of explosives, which prompted Officer Melendez Ortiz to notify his supervisor.

Supervisory Transportation Security Officer Tiffany Pagan informed Ramsingh that TSA would need to conduct a full-body pat-down and further screening of his property to clear the positive explosives alarm. Ramsingh objected to the pat-down, explaining that he suffers from Post-Traumatic Stress Disorder and Military Sexual Trauma, conditions which would be triggered by a full-body pat-down. Officer Pagan then asked one of her male colleagues, Supervisory Transportation Security Officer Robert McClelland, to assist. While acknowledging Ramsingh's medical concerns, Officer McClelland insisted that there was "no alternative" to a pat-down for resolving an explosive trace detection alarm. A. 83. Ramsingh continued to refuse. Officer McClelland next offered to conduct the pat-down in a private or less crowded area of the checkpoint, but Ramsingh declined.

At some point, Ramsingh indicated that he did not wish to continue with the screening process, stating "I can just leave" and "you can't detain me." A. 83. Officer McClelland acknowledged that TSA could not detain him but advised Ramsingh that if he did not comply with required screening procedures, TSA would have to call law enforcement to the checkpoint. Ramsingh replied "fine, call them." A. 83. The Transportation Security Manager and another officer subsequently arrived at the checkpoint, but they too were unable to convince Ramsingh to submit to a full-body pat-down.

Approximately twenty minutes after the encounter between Ramsingh and TSA personnel began, law enforcement officers arrived and peaceably escorted Ramsingh away from the checkpoint. In the meantime, Ramsingh's girlfriend had picked the arriving children up from their flight.

7

**B**

**1**

TSA does not dispute the legitimacy of Ramsingh's medical conditions and acknowledges that Ramsingh communicated those medical conditions to the TSA officers on the scene. Nevertheless, in May 2020, TSA charged Ramsingh with violating 49 C.F.R. § 1540.109's prohibition on interfering with security personnel and sought a civil penalty of $2,050.

Ramsingh requested a formal hearing before an Administrative Law Judge ("ALJ"). The ALJ upheld the civil penalty, finding that Ramsingh "refused to allow a pat-down search to complete screening," A. 250, and that "TSA's interpretation of its regulations—that once an individual begins the screening process at the airport, a refusal to complete the screening process constitutes 'interference' with the screener's performance of his/her screening duties"—was "reasonable[,]" A. 256–257.

The ALJ also ruled that Ramsingh's medical conditions did not excuse his noncompliance. The ALJ explained that the security interests served by uniformly requiring travelers to complete screening once the process has begun outweighed Ramsingh's medical concerns, especially because Ramsingh made a "voluntar[y]" choice to initiate the screening process, knowing "that he may be subject to a pat[-]down[.]" A. 256.

While Ramsingh's medical conditions did "not provide a valid defense[,]" the ALJ "considered [them] in mitigation[,]" along with Ramsingh's lack of prior violations, and reduced the penalty to $680. A. 256.

Ramsingh took an administrative appeal, and the TSA affirmed.

The TSA first concluded that the ALJ's findings of fact were supported by a preponderance of the evidence. Ramsingh disputed that he had "refused" the pat-down, arguing that "[j]ust as one would not say that a paraplegic 'refused' to stand, [he] did not 'refuse,' but was unable, to comply." A. 263 (citation omitted). The TSA rejected that argument, pointing out Ramsingh's admission before the ALJ that he had "refused the private screening and continued to refuse to submit to the pat-down[.]" A. 293 (citation omitted).

Next, the TSA affirmed the ALJ's legal conclusion that Ramsingh "interfere[d]" with screening personnel in violation of 49 C.F.R. § 1540.109. The agency ruled that both the plain meaning of the word "interfere" and the purpose of the regulation capture Ramsingh's "refusal to complete the screening process[.]" A. 295. That is because his noncompliance "inhibited the screeners from resolving the positive test for explosives and completing the screening process[,]" and so "prevented TSA [officers] from thoroughly performing their duties[.]" A. 295.

Ramsingh argued that the ALJ erred because Section 1540.109 requires an intentional *mens rea*. The TSA disagreed, explaining that Section 1540.109 qualifies as a public welfare regulation designed "to protect the safety and security of the flying public[,]" and so no *mens rea* is necessary. A. 299–300.

At a minimum, Ramsingh insisted, the regulation requires a volitional act, and failing to comply on the basis of medical inability cannot be considered volitional. The TSA disagreed,

concluding that Ramsingh engaged in a volitional act by entering the security screening process with knowledge that he might be required to undergo a pat-down, and another volitional act by refusing to be patted down after he tested positive for potential explosives.

With respect to the ALJ's conclusion that Ramsingh's medical conditions did not excuse his interference, the TSA determined that precedent and policy justifications support requiring an individual who begins the screening process to complete it or else be found liable for interference, regardless of the reason for failure to comply. A rule to the contrary, TSA concluded, would "require a fundamental change to TSA's security program * * * that would adversely affect TSA's ability to protect the aviation system." A. 301.

Finally, the TSA agreed that a $680 penalty was appropriate.[2]

Ramsingh filed a timely petition for review in this court.

## III

This court has jurisdiction over Ramsingh's petition for review under 49 U.S.C. § 46110.

In reviewing a petition under Section 46110, we uphold the agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" 5 U.S.C. § 706(2)(A), or unsupported by "substantial evidence," 49 U.S.C. § 46110(c); *see Suburban Air Freight,*

---

[2] Ramsingh has not independently challenged the size of the fine. *See* Oral Arg. Tr. 12:15–18 ("You haven't independently challenged a sizable fine?" "It's not the size of the fine that's the issue here, no.").

*Inc. v. TSA*, 716 F.3d 679, 681 (D.C. Cir. 2013).  The arbitrary and capricious standard is "deferential[,]" merely requiring that the agency action be "reasonable and reasonably explained." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 409 (D.C. Cir. 2020) (citation omitted).

**IV**

Ramsingh argues that TSA erred by concluding that (1) he violated 49 C.F.R. § 1540.109's prohibition on interference merely by failing to comply with the required screening procedures, and (2) his *bona fide* medical conditions did not excuse noncompliance.

**A**

**1**

The central question raised by Ramsingh in this case is whether the TSA reasonably concluded that his refusal to submit to a full-body pat-down after voluntarily entering a screening area "interfere[d]" with the TSA's screening process, within the meaning of 49 C.F.R. § 1540.109.  The TSA's conclusion that such interference occurred was adequately reasoned and supported by substantial evidence.  In so holding, we need not accord deference to TSA's interpretation of its regulation under *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), because, after "exhaust[ing] all the 'traditional tools' of construction[,]" we conclude that the regulation is not "genuinely ambiguous," *id.* at 2415 (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).

TSA regulations do not define "interfere," so we begin with the "ordinary, contemporary, common meaning" of the term.  *Williams v. Taylor*, 529 U.S. 420, 431 (2000) (citation

omitted). Webster's New International Dictionary defines "interfere" as "to come in collision[,]" "to be in opposition[,]" and "to run at cross-purposes[.]" *Interfere*, WEBSTER'S NEW INT'L DICTIONARY 1178 (def. 2) (3d ed. 2002); *see also Interfere*, WEBSTER'S NEW COLLEGE DICTIONARY 578 (def. 1) (2d ed. 1999) (defining "interfere" as "[t]o come between so as to be an impediment"); *Interference*, BLACK'S LAW DICTIONARY 818 (def. 2) (7th ed. 1999) (defining "interference" as "[a]n obstruction or hindrance"). Common synonyms for "interfere" include "impede, obstruct, stand in the way of, hinder, * * * [and] hamper." *Interfere*, THE OXFORD AMERICAN WRITER'S THESAURUS 490 (def. 1) (2004) (formatting modified).

In the same vein, this court has recently defined the "ordinary meaning" of interfere as "to interpose in a way that hinders or impedes: comes into collision or be in opposition." *Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 3 F.4th 390, 396 (D.C. Cir. 2021) (quoting *Interfere*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/interfere (last accessed July 7, 2022)). And in a case interpreting Section 1540.109 itself, the Sixth Circuit defined the term "interfere" in the regulation as to engage in "conduct which poses an actual hindrance to the accomplishment of a specified task." *Rendon v. TSA*, 424 F.3d 475, 480 (6th Cir. 2005) (internal quotation marks and citation omitted).

Given that established meaning, the TSA logically concluded that Ramsingh's conduct interfered with TSA personnel engaged in screening operations. TSA policy requires that whenever an individual triggers a positive explosives alarm, he or she must undergo a full-body pat-down. Ramsingh's repeated resistance to being patted down was "in opposition" to and "r[a]n at cross-purposes" with that policy. *Interfere*, WEBSTER'S NEW INT'L DICTIONARY, *supra*.

Likewise, his insistence on leaving the checkpoint rather than undergo the pat-down "hinder[ed]" and "impede[d]," *Judge Rotenberg Educ. Ctr.*, 3 F.4th at 396 (citation omitted), the TSA officers' ability to enforce the requirement that a person who begins screening must see the process through, a policy that TSA has determined to be necessary for maintaining aviation security.

To be sure, Section 1540.109 also covers conduct more aggressive or actively disruptive than Ramsingh's. For instance, the regulation's preamble cites "[p]revious instances" of "verbal abuse of screeners by passengers[.]" 67 Fed. Reg. at 8,344. In *Rendon*, the petitioner behaved in a "loud and belligerent" manner at a checkpoint, yelling profanities at the TSA officer. 424 F.3d at 477, 479. Similarly, in *In the Matter of John Brennan*, 12-TSA-0092 (Sept. 18, 2014), *aff'd* 691 F. App'x 332 (9th Cir. 2017), when Brennan tested positive for explosives, he stripped naked at the checkpoint and refused to put his clothes back on, requiring TSA employees to close the checkpoint and move bins around to block the public's view, *id.* at 1–2.

Ramsingh did not physically assault or threaten anyone, yell, use profanity, behave in a belligerent manner, or remove his clothing. Nor did his resistance to the pat-down necessitate closing the checkpoint or cause delays in the screening of other passengers at that checkpoint. But even acknowledging Ramsingh's more mild-mannered behavior, TSA reasonably concluded that Ramsingh nonetheless prevented TSA officers from completing their required screening duties. That was the crux of the interference findings in *Rendon* and *Brennan*, and was at the heart of the finding of interference by the TSA here. *See Rendon*, 424 F.3d at 479 (holding that, whatever Rendon's First Amendment interests, he directly "interfered with the screener's duty to both thoroughly screen passengers and to do

so in an efficient manner"); *Brennan*, 12-TSA-0092, at 3 (concluding that Brennan "presented an actual hindrance to the [officers'] ability to conduct secondary screening and resolve the [explosive trace detection] alarm").

So too here, while Ramsingh remained relatively calm and composed throughout the entire encounter, he prevented TSA personnel from conducting a full-body pat-down in response to a positive explosives alarm and from enforcing the agency's security policy prohibiting individuals from backing out of screening midway.[3]

Ramsingh argues that he merely engaged in "passive non-compliance," which, "without more, [is] insufficient to constitute interference." Ramsingh Opening Br. 13. In support, he points to *District of Columbia v. Little*, 339 U.S. 1 (1950). In *Little*, a District of Columbia regulation made it a misdemeanor to "interfer[e] with or prevent[] any inspect[or]" from examining a building reported to be in an unsanitary condition. *Id.* at 4–5 (citation omitted). The Supreme Court held that the "regulation [could] not fairly be interpreted to encompass" Little's "failure to unlock her door and her remonstrances on constitutional grounds[,]" *id.* at 7, noting that the regulation did not "impose any duty on home owners to assist health officers to enter and inspect their homes[,]" *id.* at 6.

That case, interpreting a different regulation in the constitutionally sensitive context of a governmental entry into the home, is of no help to Ramsingh. For one, *Little* involved a criminal offense, whereas Section 1540.109 imposes only a

---

[3] Ramsingh does not rely on the medical basis for his noncompliance in this first part of his argument about the proper meaning of "interference" in 49 C.F.R. § 1540.109.

civil penalty. Even more relevantly, Ramsingh's interference involved his failure to adhere to required processes in a highly regulated public area into which he voluntarily entered with full notice that he could be subjected to search procedures, including a pat-down. *Cf. Little*, 339 U.S. at 7 ("The right to privacy *in the home* holds too high a place in our system of laws to justify a statutory interpretation that would impose a criminal punishment on one who does nothing more than [Little] did here.") (emphasis added).

Ramsingh, in other words, "affirmatively refused to" complete the screening process at a TSA checkpoint that he freely chose to enter, and he asserted no constitutional objection to the pat-down at the time. *United States v. Willfong*, 274 F.3d 1297, 1299, 1302 (9th Cir. 2001) (rejecting analogy to *Little* when a logger was charged with "interfering with [a] forest officer engaged in * * * the performance of his official duties[,]" after "affirmatively refus[ing] to discontinue logging *on Forest Service land* when ordered to do so by a forest officer") (citation omitted).

**2**

TSA's reading of "interfere" also comports with the regulation's history and purpose. Section 1540.109 was promulgated in the aftermath of the September 11th attacks and in response to a congressional demand for "increased air transportation security measures." 67 Fed. Reg. at 8,340. The preamble to the final rule explains that Section 1540.109 is written to broadly prohibit any action that poses a risk of "distract[ing] or inhibit[ing] a screener from effectively performing his or her duties." *Id.* at 8,344. The preamble further explains that:

> A screener encountering such a situation must turn away from his or her normal duties to deal

> with the disruptive individual, which may affect the screening of other individuals. The disruptive individual may be attempting to discourage the screener from being as thorough as required. The screener may also need to summon a checkpoint screening supervisor and law enforcement officer, taking them away from other duties. Checkpoint disruptions potentially can be dangerous in these situations. This rule supports screeners' efforts to be thorough and helps prevent individuals from unduly interfering with the screening process.

*Id.*

As a consequence of Ramsingh's noncompliance with screening procedures, a Transportation Security Officer, three Supervisory Transportation Security Officers, and the on-duty Transportation Security Manager had to "turn away from [their] normal duties" for approximately 20 minutes. 67 Fed. Reg. at 8,344. In addition, both the Federal Security Director and Assistant Federal Security Director for the entire Tampa International Airport were involved, diverting their attention from other important matters. Most importantly, TSA was unable to conduct the "thorough" screening of Ramsingh that it has deemed necessary for airport safety, or to enforce its security policy that those who choose to enter a screening area are required to complete the screening process. *Id.*

In short, Ramsingh's conduct objectively interfered with TSA operations in multiple respects, presenting the type of aviation security concerns addressed by the regulation's prohibition on interference.

**B**

Ramsingh also contends that the TSA erred because specific intent is required to violate the regulation. Ramsingh is incorrect.

First, the regulation is silent as to *mens rea*. *See* 49 C.F.R. § 1540.109. So TSA's decision was consistent with the regulatory text.

Second, while silence on *mens rea* is not dispositive for *criminal* statutes, *Staples v. United States*, 511 U.S. 600, 606 (1994), here we are dealing with a civil penalty for the violation of an administrative regulation. And not just any regulation, but one designed to promote the public safety and welfare. The regulation's primary purpose is not to punish wrongdoers, but to protect the safety of passengers, airline personnel, and the public more broadly by ensuring that all individuals are thoroughly screened before being permitted into the secure area of an airport. While interfering with TSA screening personnel in the performance of their duties may not result in any "direct or immediate injury to person or property" in a particular case, it "create[s] the danger or probability of" someone being able to sneak a weapon or other dangerous item onto an aircraft, an obvious safety and security risk "which the [regulation] seeks to minimize." *Morissette v. United States*, 342 U.S. 246, 256 (1952); *see also Federal Express Corp. v. Department of Commerce*, No. 20-5337, slip op. at 24–25 n.5, 27 (D.C. Cir. July 8, 2022).

When construing statutes dealing with public welfare or regulatory offenses, courts "have inferred from silence that Congress did not intend to require proof of *mens rea* to establish an offense[,]" *Staples*, 511 U.S. at 606, and we can make the same type of inference here. *See Morissette*, 324 U.S. at 256 ("[L]egislation applicable to such [public welfare]

offenses, as a matter of policy, does not specify intent as a necessary element[,]" because "whatever the intent of the violator, the injury is the same[.]"). Given that Section 1540.109 is a public welfare regulation "meant to protect the safety and security of the flying public[,]" A. 299–300, TSA had no obligation to find specific intent on Ramsingh's part.

Ramsingh objects that TSA's interpretation would produce untenable results, such as fining a passenger who "accidentally drops a bin and delays an x-ray line," or "who spills a bottle of liquid requiring a lane to close for clean-up[.]" Ramsingh Opening Br. 22.

That argument confuses specific intent (*i.e.*, intent to interfere with TSA screening personnel in the performance of their duties) with general intent (*i.e.*, intent to engage in the conduct that causes the interference). *See* 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 5.2(e) (3d ed. 2018) (General intent requires "at least an intention to make the bodily movement which constitutes the act which the [offense] requires[,]" whereas specific intent is used "to designate a special mental element which is required above and beyond any mental state required with respect to the *actus reus* of the [offense].").

We do not understand TSA to have held that no *general* intent is required to violate Section 1540.109—merely that no *specific* intent is required. *See* A. 298–299 (discussing *Morissette*, public welfare offenses, and "the levels of intent"). And Ramsingh's actions satisfy any general intent requirement. While the traveler who accidentally drops a bin cannot be said to have intended to do so, the record shows that Ramsingh intended to refuse compliance with the pat-down requirement.

## C

Next, Ramsingh asserts that, as applied to him, Section 1540.109 is unconstitutionally vague. Not so.

An enactment violates the Due Process Clause if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Beckles v. United States*, 137 S. Ct. 886, 892 (2017) (citation omitted); *see also United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (An enactment is "unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning specifies no standard of conduct at all.") (formatting modified and citation omitted). In applying this rule, the law has "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–499 (1982).

Ramsingh posits several hypotheticals in which he claims travelers would lack fair notice that they "interfere[d]" with security personnel, within the meaning of Section 1540.109. For instance, Ramsingh asks whether a passenger who tells a joke to a screener or forgets to remove his or her belt before approaching the metal detector will have sufficiently distracted a screener to be held liable under Section 1540.109.

But imagining scenarios in which application of the regulation might be impermissibly vague is of no help to Ramsingh because an individual "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman Estates*, 455 U.S. at 495. Especially so because Ramsingh explicitly characterizes his vagueness argument as

an as-applied, rather than facial, challenge. *See* Ramsingh Reply Br. 14.

Ramsingh's burden instead is to show that the regulation is unconstitutionally vague as applied to the facts of his case. He cannot do that.

TSA regulations, in combination with publicly posted guidance, give fair notice that failure to comply with required screening procedures, which can include a pat-down, will constitute prohibited interference. *See* 49 C.F.R. § 1540.107(a) ("No individual may enter a sterile area or board an aircraft without submitting to the screening and inspection of his or her person[.]"); *id.* § 1542.201(b) ("Each airport operator [is] required to * * * [p]ost signs at secured area access points and on the perimeter that provide warning of the prohibition against unauthorized entry."); *Security Screening*, TSA, https://www.tsa.gov/travel/security-screening (last accessed July 7, 2022) ("Pat-Down Screening" drop-down box) ("You may be required to undergo a pat-down procedure if the screening technology alarms, as part of unpredictable security measures, for enhanced screening, or as an alternative to other types of screening, such as advanced imaging technology screening."). Because Ramsingh's conduct is "clearly proscribed" by the regulation, his as-applied vagueness challenge fails. *Hoffman Estates*, 455 U.S. at 495; *see also Rendon*, 424 F.3d at 480 (rejecting vagueness challenge to Section 1540.109); *Brennan*, 691 F. App'x at 332–333 (same).

## V

Lastly, Ramsingh insists that, even if noncompliance generally can qualify as interference under Section 1540.109, noncompliance grounded in medical reasons cannot. More specifically, Ramsingh contends that (i) his medical inability to comply rendered his actions non-volitional, and (ii) imposing a

fine given his medical conditions violates substantive due process. Neither argument succeeds.

**A**

A foundational element of "[t]he general rule of both civil and criminal responsibility is that a person is not liable for a harm done unless he caused it by his action (*actus reus*)[.]" *Western Fuels-Utah, Inc. v. Federal Mine Safety & Health Rev. Comm'n*, 870 F.2d 711, 713 (D.C. Cir. 1989). The TSA found that Ramsingh engaged in two volitional acts that support his culpability: (1) electing to enter the security checkpoint and begin the screening process knowing he may be subject to a pat-down, and (2) refusing to be patted down and to complete the screening process. The TSA was wrong as to the first but not the second.

Certainly the first act—entering the screening area and initiating screening—was a voluntary act. But it does not by itself support his liability. Nothing about merely approaching a TSA checkpoint and presenting yourself and your possessions for inspection violates Section 1540.109.

The second act identified by TSA, however, was both volitional and violated Section 1540.109. Ramsingh explained that he considered his options to be (1) allow TSA to conduct the pat-down in public, (2) allow TSA to conduct the pat-down in private, (3) run from the checkpoint, or (4) continue to refuse and ask for law enforcement. He deliberately chose the fourth option. And that choice contravened the regulation because Ramsingh's refusal to submit to a full-body pat-down prevented TSA officers from carrying out their mandatory screening duties. *See* 49 C.F.R. § 1540.109.

Ramsingh argues that his refusal was not volitional because, "for medical reasons, he was *unable* to comply."

Ramsingh Opening Br. 24. But Ramsingh specifically admitted in the administrative proceedings that he "refused" to comply with the pat-down requirement. A. 108–109. Whatever his reasons for noncompliance, that refusal, which he selected from among various available courses of action, satisfies the volitional-act requirement.

**B**

Ramsingh next argues that if his medical inability to comply does not excuse his interference, then the regulation is "sufficiently shocking of the conscience to rise to the level of a deprivation of substantive due process rights." Ramsingh Opening Br. 12. That is incorrect.

To violate substantive due process, governmental action must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). Not every unfortunate or regrettable event amounts to a substantive due process violation. "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense[.]'" *Id.* at 846 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)). Given that demanding standard, TSA's imposition of a $680 fine for Ramsingh's noncompliance with required screening procedures—even if the reason for that noncompliance was his Post-Traumatic Stress Disorder and Military Sexual Trauma—did not infringe Ramsingh's substantive due process rights.

While deliberate indifference to medical needs can violate substantive due process, *Lewis*, 523 U.S. at 849–850, the TSA officers did not exhibit such callousness to Ramsingh's medical conditions. They allowed him to go through a metal detector rather than the AIT machine due to his shoulder injury. The pat-down was necessitated by Ramsingh's hand-swipe testing

positive for explosive residue. When Ramsingh explained his discomfort with a pat-down, TSA offered to conduct the search in a more private area. While the accommodations provided did not fully meet Ramsingh's medical needs, the TSA officers made a good-faith effort to respect his particular conditions while also performing their security and public-safety duties.

In sum, on this record, TSA's conduct did not approach the level of egregiousness or outrageousness needed to establish a violation of substantive due process.[4]

## VI

For all those reasons, we deny Ramsingh's petition for review.

*So ordered.*

---

[4] We note that Ramsingh did not raise, either before the agency or this court, a claim under the Rehabilitation Act, 29 U.S.C. § 794, or any other claim alleging that TSA discriminated against him on the basis of disability. So neither the TSA nor we have had any occasion to address whether TSA's decision comports with federal disability law.