[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-14237

_____

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

*versus*

JUSTIN W. KEENER,
d.b.a. JMJ Financial,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-21254-BB

_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN and BRASHER, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether Justin Keener violated the Securities Exchange Act of 1934 by buying and selling securities as an unregistered "dealer." 15 U.S.C. § 78*o*(a). Keener made more than $7.7 million by purchasing convertible debt notes from microcap issuers, converting those notes into common stock, and selling the stock in high volumes in the public market. The Securities and Exchange Commission filed this civil enforcement action against Keener, and the district court granted summary judgment for the Commission. It enjoined Keener from future securities transactions as an unregistered dealer and ordered him to disgorge the profits from his convertible-note business. We affirm.

## I. BACKGROUND

Justin Keener was a sole proprietor doing business as JMJ Financial, a fictitious name that he registered in Florida in 2008. Keener's business model involved purchasing convertible notes from microcap issuers, converting those notes into new issues of common stock, and selling that stock into the public market at a profit. The convertible notes that Keener purchased obligated issuers to pay sums of principal and interest within a designated time. The notes also guaranteed Keener the option of receiving repayment in the form of the issuer's stock. Keener demanded and received "highly favorable" terms for these conversion options—

typically, the notes allowed Keener to covert debt to common stock at a discount of 30 to 40 percent from the market price.

Keener's lending behavior—converting debt to stock at a significant discount and selling the resultant shares in high volumes—is known as "toxic" or "death spiral" financing. *See SEC v. Almagarby*, 92 F.4th 1306, 1312 (11th Cir. 2024) (citation and internal quotation marks omitted); *Crown Bridge Partners, LLC v. Sunstock, Inc.*, No. 18 Civ. 7632 (CM), 2019 WL 2498370, at *1 (S.D.N.Y. June 3, 2019). The arrangements can harm microcap companies and existing investors by causing the stock price to "drop to or near a zero-dollar value." *Crown Bridge*, 2019 WL 2498370, at *1.

Keener or his employees identified viable issuers, "negotiated the terms of the convertible notes" directly with those issuers, and "signed contracts to memorialize" those notes. Although the notes allowed issuers to prepay in cash and avoid the dilutive effects of conversion, prepayment occurred only "10 to 20 percent" of the time. This practice was by design because when an issuer "prepaid a note, [Keener] would make less money." Keener "made money on conversions"—at profit margins of 50 to 100 percent—because of the conversion discount. Keener decided when to covert an issuer's outstanding debt, and he did so by placing requests with the issuer's transfer agent and with his own brokerage firm. Keener's conversion request would trigger the creation of new shares that "w[ere not] in the market before." When the new shares were deposited into Keener's brokerage accounts, "it was important for

him to sell the stock . . . as soon as he could," within six to nine months as "the rule of thumb."

From January 2015 through January 2018, Keener's business operations were extensive. He made at least $7.7 million in profits from the sales of converted stock, purchased debt notes from at least 100 microcap issuers, and liquidated "billions" of microcap shares. Keener operated out of a 7,400-square-foot office in San Diego and had additional offices in Miami and San Juan, Puerto Rico. He employed as many as 25 individuals, including a chief financial officer, a general counsel, a marketer, accountants, and multiple employees tasked with identifying microcap companies in need of financing. He had an employee payroll of $2,695,185 in 2015, $2,428,808 in 2016, and $1,629,300 in 2017.

Keener advertised aggressively and held himself out to microcap issuers as willing to buy convertible debt. He maintained a public website and issued press releases touting his "QuickLoan" convertible-note program: Keener asserted that QuickLoan could provide companies with "up to $500,000 in working capital utilizing a simple, two-page promissory note," and that with "over 200 Nasdaq, OTC Markets, NYSE, and OTCBB companies in its portfolio and a long and highly successful track record, JMJ Financial is one of the most active and reliable investors in the [microcap] space."

Keener invested more than $3 million to develop proprietary "lead generation" and other software, which allowed him to screen public filings with the Securities and Exchange Commission to

identify potential issuers. His employees contacted hundreds of the companies identified by the software. Keener also sponsored, attended, and spoke at lavish microcap industry conferences, where he solicited issuers selling convertible notes. For example, he hosted a dinner at Nobu in Las Vegas for brokers and finders, and he sponsored an all-expenses paid "Broker and Finder Seminar" at the Wynn Hotel, where he covered airfare and accommodations for the attendees.

Keener never registered as a dealer with the Commission. He was once an "associated" person who held an ownership interest in a registered broker-dealer. But the Financial Industry Regulatory Authority, or FINRA—a national self-regulatory organization that oversees registered securities dealers—disbarred Keener in 2012 for refusing to cooperate with its investigation of whether he illegally underwrote microcap stock offerings. *See* 15 U.S.C. § 78s(d) (procedure for disciplinary actions by a self-regulatory organization). FINRA forbade Keener from future association with any member in any capacity.

The Commission filed this enforcement action against Keener, charging that he operated as an unregistered dealer in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78*o*(a). The Commission submitted expert reports attesting that 93 percent of the microcap issuers who borrowed from Keener experienced price declines in their shares, and that those price declines primarily harmed retail investors. Even as this suit was pending, Keener sold stock holdings acquired through his convertible-note

business but made "materially false" statements to the district court by asserting that the stock was unrelated to the ongoing litigation.

The district court granted summary judgment for the Commission. It then partially adopted the magistrate judge's report and recommendation, which relied on the Commission's expert. The district court calculated that Keener had made net profits, subject to disgorgement, of over $7.7 million. The district court also credited the Commission's assertion that it intended to "distribute any disgorgement it collect[ed] . . . to harmed investors." It enjoined Keener from future violations of section 15(a)(1) of the Exchange Act and imposed a five-year penny-stock bar, ordered disgorgement of $7,786,639 in profits plus prejudgment interest, and imposed a civil penalty of $1,030,000.

## II. STANDARDS OF REVIEW

We review *de novo* a summary judgment. *Sutton v. Wal-Mart Stores E., LP*, 64 F.4th 1166, 1168 (11th Cir. 2023). We review for an abuse of discretion the district court's choice of equitable remedies. *See SEC v. Calvo*, 378 F.3d 1211, 1216–17 (11th Cir. 2004).

## III. DISCUSSION

We divide our discussion into four parts. First, we explain that Keener operated as an unregistered dealer in violation of section 15(a) the Exchange Act. Second, we explain that Keener's arguments that the district court violated his rights to due process and equal protection are meritless. Third, we explain that the district court did not abuse its discretion by imposing an injunction.

Fourth, we explain that the district court did not abuse its discretion by ordering disgorgement.

### A. Keener Operated as an Unregistered Exchange Act "Dealer."

Section 15(a) of the Exchange Act makes it unlawful for a "dealer" to use interstate commerce to "effect any transactions in . . . any security" unless he registers with the Commission. *See* 15 U.S.C. § 78*o*(a)(1). A dealer is "any person engaged in the business of buying and selling securities . . . for such person's own account." *Id.* § 78c(a)(5)(A). A dealer is "a professional market-maker" who "matches the buyers and sellers of securities" and whose business model depends on "his *volume* of buying and selling because he profits from executing trades." *Almagarby*, 92 F.4th at 1315. The word "business" is the "centerpiece" of the Exchange Act's dealer definition: a dealer is one whose "*entire* business model [i]s predicated on the purchase and sale of securities." *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015); *see Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 361–62 (5th Cir. 1968) ("National purchased many church bonds prior to the ones in question for its own account as a part of its *regular business* and sold some of them. Thus National was a broker and a dealer within the meaning of the [Securities Exchange] Act." (emphasis added)). An unregistered dealer may not buy or sell securities in interstate commerce. *See* 15 U.S.C. § 78*o*(a)(1).

In *Almagarby*, which arose out of the series of Commission actions against toxic lenders, we held that Almagarby's lending activities rendered him a "dealer" under the Exchange Act. 92 F.4th

at 1316–18. Almagarby purchased existing microcap debt held by third parties and negotiated with the issuers to obtain conversion options carrying a significant discount. *Id.* at 1313. He then converted his debt holdings and sold the resultant new shares "as fast as possible." *Id.* (internal quotation marks omitted). Almagarby's operations were smaller and less professional than Keener's—Almagarby netted $885,000 in profits, never had any employees, never advertised or publicly held himself out as a buyer or seller of securities, and never attended any industry conferences or meetings. *Id.* at 1313–14 (citing *Guide to Broker-Dealer Registration*, U.S. SEC. & EXCH. COMM'N (last modified Dec. 12, 2016), https://perma.cc/YN2X-TZED)). Still, we found that the "regularity" of Almagarby's transactions; that his "*entire* business was predicated on flipping penny stocks"; that he "relied on high volumes of trade execution to profit"; and that he "brought *new* [microcap] shares to the market" were enough to render him an Exchange Act dealer. *Id.* at 1316–17.

Keener's business model was materially similar to Almagarby's. Most of Keener's profits were made from converting microcap debt into stock at a discount and selling the resultant shares in high volumes. Like Almagarby, Keener's conversions and sales brought new microcap shares to the public market. If anything, Keener's business operations were more extensive: he purchased more debt, sold a higher volume of shares in the public market, made significantly more profit, and directly employed others in his scheme. And unlike Almagarby's activity, Keener's activity *did* directly implicate the Commission's public guidance for defining

22-14237          Opinion of the Court          9

broker-dealers. *See Guide to Broker-Dealer Registration*, *supra* (an individual who "holds himself out as being willing to buy and sell a particular security on a continuous basis" or "advertise[s] or otherwise let[s] others know that [he is] in the business of buying and selling securities" might need to register as a dealer). Keener maintained a public website; developed proprietary software and issued press releases to solicit borrowers; and sponsored and attended lavish industry conferences for microcap issuers. The nature, volume, regularity, and frequency of Keener's transactions render him a dealer.

Keener contends that because he never effectuated securities orders for *customers*, he could not have been an Exchange Act dealer. He argues that market participants and Congress historically "presumed" that dealers handled orders for customers; that the statutory phrase, acting as a dealer for his "own *account*," is a term of art presupposing that trades executed through a dealer's account are for customers, *see* 15 U.S.C. § 78c(a)(5)(A) (emphasis added); and that the "legal backdrop" and the Exchange Act's structure imply that dealers must have customers.

*Almagarby* forecloses Keener's customer-requirement argument. We explained there that "a customer requirement has no grounding in the statutory text" of the Exchange Act. 92 F.4th at 1318. Although many dealers execute trades on behalf of customers, the Exchange Act makes no mention of a customer-facing role in its statutory definition. Instead, the Act defines dealers by their function, as being "*in the business* of buying and selling securities,"

15 U.S.C. § 78c(a)(5)(A) (emphasis added); *see also Almagarby*, 92 F.4th at 1315 (a dealer is a market participant whose "business model depends on his *volume* of buying and selling because he profits from executing trades" and who "provide[s] market liquidity"); *Eastside Church*, 391 F.2d at 361–62. Since the enactment of section 15(a), the "dealer" definition has been understood to cover a trader "who *has no customers* but merely trades for his own account through a broker," so long his operations "are sufficiently extensive to be regarded as a regular business." CHARLES H. MEYER, THE SECURITIES EXCHANGE ACT OF 1934 ANALYZED AND EXPLAINED 34 (1934) (emphasis added). Indeed, several Exchange Act provisions apply to a dealer "who does *not* carry customer accounts" "or hold funds or securities for customers." *Almagarby*, 92 F.4th at 1318 (alterations adopted) (quoting 17 C.F.R. § 240.15c3–1(a)(2)(vi), (6)(ii)). Keener operated as an unregistered Exchange Act "dealer."

### B. The Commission Did Not Violate Keener's Rights to Due Process or Equal Protection.

Keener argues that the Commission violated his due-process right to "fair notice," *see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), by pressing an enforcement theory that "[n]o one could've seen . . . coming." He asserts that he "acted in accord with longstanding industry practice" and points to the Commission's tolerance of penny-stock flipping—i.e., the discounted acquisition and resale of *existing* microcap shares—and convertible debt lending.

22-14237            Opinion of the Court            11

The fair-notice principle "has been recognized in only a 'very limited' set of cases," and we have declined to apply it in this context. *See Almagarby*, 92 F.4th at 1319 (quoting *Suburban Air Freight, Inc. v. Transp. Sec. Admin.*, 716 F.3d 679, 684 (D.C. Cir. 2013)). We explained in *Almagarby* that the Commission's "dealer" definition fairly accords with our precedents interpreting the Exchange Act. *Id.* Although the Commission might have tolerated stock-flipping of existing shares and convertible lending in general, it has never issued guidance condoning the *combination* of transactions for which Keener has been sued. So the Commission's enforcement theory does not deprive Keener of fair notice and is not a due-process violation.

Keener also argues that his equal-protection right was violated because the Commission sought sanctions against him while offering other "prominent [market] participants" a yearlong grace period to register as dealers without penalty. *See Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer*, 87 Fed. Reg. 23,054, 23,062 (Apr. 18, 2022). This argument is meritless. Keener points to a proposed Commission rule that would require market participants who play a "central role as liquidity providers" in the U.S. Treasury market—that is, high-frequency and algorithmic traders who buy and sell government bonds—to register as dealers. *See id.* at 23,055. The proposed rule asserts that liquidity providers already act as dealers because they buy and sell securities "as part of a regular business," but the rule offers a post-adoption grace period for the providers to register without penalties. *Id.* at 23,058, 23,062.

To prove that he suffered unequal treatment under the proposed rule, Keener must show that he is "similarly situated" to the liquidity providers who would benefit from the rule's grace period. *See Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Keener cannot make that showing. For one thing, he is not one of the market participants who play a "central role as liquidity providing intermediaries in the U.S. Treasury market." 87 Fed. Reg. at 23,056. For another, in the light of his FINRA bar, it is doubtful that Keener would be permitted to register with the Commission to avail himself of the grace period. Because Keener cannot prove that he is similarly situated to the liquidity providers, his equal-protection argument fails.

### C. The District Court Did Not Abuse its Discretion by Imposing a Permanent Injunction.

Keener argues that the district court imposed an impermissibly vague "obey-the-law" injunction that failed to "clearly and specifically describe permissible and impermissible conduct." *See SEC v. Graham*, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016) (citation and internal quotation marks omitted). He proposes instead a narrower injunction that would prohibit him only from "engaging in the convertible note transactions, note conversions, acts, practices or courses of business *described in the Complaint*."

The grant of injunctive relief "rests within the sound discretion of the trial court and will not be disturbed unless there has been a clear abuse of it." *SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir.

1978) (citation and internal quotation marks omitted). An injunction prohibiting violations of securities regulations must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." *SEC v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012) (quoting FED. R. CIV. P. 65(d)(1)) (internal quotation marks omitted). Yet "a broad, but properly drafted injunction, which largely uses the statutory or regulatory language," is permissible "so long as it clearly lets the defendant know what he is ordered to do or not." *Id.* at 952. And a broader injunction might be "necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1362 (11th Cir. 2019) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949)) (internal quotation marks omitted).

The district court permanently enjoined Keener from future securities transactions as an unregistered dealer using language that largely tracks section 15(a)(1):

> Keener is . . . enjoined from directly or indirectly making use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . while *engaged in and pursuant to the regular business of buying and selling securities* . . . for his own account through a broker or otherwise unless Keener is registered as a dealer with the Securities and Exchange Commission, or unless he is associated with a broker-dealer that is so registered.

(Emphasis added). But the injunction also makes an important substitution to the statutory language. Although section 15(a)(1) generally prohibits "any broker or dealer" from engaging in unregistered dealing, *see* 15 U.S.C. § 78*o*(a)(1), the injunction specifically describes the activity that rendered Keener a dealer: "the regular business of buying and selling securities."

The district court provided *more* detail than the Exchange Act language to describe proscribed dealer activity. *See Goble*, 682 F.3d at 952 (an injunction may "largely" track "statutory or regulatory language" so long as it specifically describes proscribed conduct). It also took care to excise "unnecessary references to law and regulations," instead using plain language to describe the acts addressed by the injunction. And it recognized Keener's "decade-long history of noncompliance and nondisclosure"; his "firm position in the financial industry"; and his "misrepresentation and obfuscation" of his securities transactions while this very litigation was ongoing, to determine that a broader injunction was necessary to prevent future misconduct. *See Askins & Miller*, 924 at 1362. Indeed, it is Keener's proposed language, which cross-references the complaint, that would violate the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 65(d)(1)(C) (injunction may not "refer[] to the complaint or other document" to explain the acts enjoined). We cannot say that the district court abused its discretion.

### D. The District Court Did Not Abuse its Discretion by Ordering Disgorgement.

The district court ordered Keener to disgorge $7,786,639 of profits from his convertible-note business. Keener argues that the district court abused its discretion in two ways: first, there is no causal connection between Keener's profits and his failure to register; and second, the disgorged profits would not "be awarded for victims," *see Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020).

Keener's arguments are both foreclosed by *Almagarby*, 92 F.4th at 1319–20. First, Keener's profits were causally linked to his failure to register because section 15(a) prohibits unregistered dealers from effecting "*any* transactions in . . . any security" in interstate commerce. 15 U.S.C. § 78*o*(a)(1) (emphasis added). Because Keener was altogether prohibited from making securities transactions, "*any* profits generated from his prohibited transactions were causally linked to his failure to register." *See Almagarby*, 92 F.4th at 1321. Second, disgorgement did not violate *Liu*'s victim-benefit requirement. The Commission offered evidence that Keener's conduct harmed investors: his sales caused price declines for 93 percent of microcap issuers who borrowed from him, and the price declines primarily affected retail investors who held those issuers' shares. The Commission also promised to distribute the disgorged profits to investor-victims who suffered from Keener's activity. These proffers satisfy the victim-benefit requirement. *See id.* at 1320–21.

16                 Opinion of the Court                 22-14237

## IV. CONCLUSION

We **AFFIRM** the judgment for the Commission.