[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13755

_____

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

*versus*

IBRAHIM ALMAGARBY,
MICROCAP EQUITY GROUP, LLC,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:17-cv-62255-MGC

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and ABUDU, Circuit Judges.

WILLIAM PRYOR, Chief Judge, delivered the opinion of the Court with respect to Parts I, II, III-A, III-B III-C, and IV, in which Circuit Judges ROSENBAUM and ABUDU joined.

ROSENBAUM, Circuit Judge, delivered the opinion of the Court with respect to Part III-D, in which Circuit Judge ABUDU joined.

This appeal concerns whether Ibrahim Almagarby violated the Securities Exchange Act of 1934 by buying and selling securities as an unregistered "dealer." 15 U.S.C. § 78o(a). Almagarby was a so-called "toxic" lender: he obtained the convertible debt of penny-stock companies, converted the debt into common stock at a steep discount, and sold the stock in high volumes. These transactions can be lucrative—Almagarby made over $885,000 in profits in three and a half years—but they are disfavored by other investors because they dilute the value of extant shares and often cause penny-stock prices to plummet. And one cannot engage in these transactions without being a registered dealer, which Almagarby was not. The Securities and Exchange Commission filed this civil action against Almagarby as part of a broader crackdown against toxic lending. The district court granted summary judgment for the Commission, ordered Almagarby to disgorge all profits, and permanently enjoined him from future securities law violations and participation in penny-stock offerings. We conclude that Almagarby was a "dealer" under the Exchange Act and disgorgement was an appropriate remedy, but that the district court abused its

discretion by imposing the penny-stock ban. We therefore affirm in part and reverse in part.

## I. BACKGROUND

Ibrahim Almagarby was a college student when he formed Microcap Equity Group LLC, a Florida limited liability company, in January 2013. Almagarby was the sole owner, employee, and "controlling person" of Microcap, and its profits were his sole means of financial support. Almagarby's business model involved purchasing the debt instruments of penny-stock (also called microcap) companies, converting that debt into common stock, and selling the stock rapidly.

In the investment industry, Almagarby's conduct is called "toxic" or "death spiral" financing. *See* Ari Zoldan, *What Toxic Financing Is and How Public Companies Can Avoid It*, NASDAQ (Mar. 16, 2023, 10:31 a.m.), https://perma.cc/2GM3-BBXB. Toxic financing is a form of predatory lending to microcap companies often struggling to obtain capital. *See id.* A toxic lender provides financing in the form of convertible debt—that is, debt that can be converted into common stock, almost always at a discount to market price. The lender then converts and sells in large volumes, typically liquidating only a fraction of its debt holdings at a time to ensure that an entire tranche is sold before the next is converted at a discount to the new, still lower price. The influx of shares causes prices to plummet, the share dilution drives good-faith investors out of the market, and the issuing microcap company, or "issuer," can no longer access legitimate financing, a fact that may be the death

knell of its business operations. *See Crown Bridge Partners, LLC v. Sunstock, Inc.*, No. 18 Civ. 7632 (CM), 2019 WL 2498370, at *1 (S.D.N.Y. June 3, 2019) ("When all is said and done, the . . . stock price can drop to or near a zero-dollar value. And the death spiral is complete."). Although not illegal, this behavior is disfavored by issuers, investors, and self-regulatory organizations.

Almagarby engaged in a variation of typical toxic lending. Instead of obtaining convertible debt directly from an issuer, he purchased existing instruments held by unaffiliated third parties. Many of the instruments he purchased did not have an existing conversion feature. So Almagarby negotiated directly with the issuers to obtain agreements that allowed him to exchange existing, non-convertible debt for convertible instruments. These agreements provided for conversion at a significant discount to market price—most often 50 percent—and many provided a "reset" feature, allowing him to reset the instrument's debt-to-stock conversion rate if the issuer's stock price dropped below a certain level. Almagarby purchased only "aged" debt—that is, debt old enough to be exempt from the registration requirements of the Securities Act of 1933 under the Commission's Rule 144. *See* 17 C.F.R. § 230.144 (providing that Rule 144 exemptions provide a "safe harbor" from Securities Act registration requirements if the security is held for over six months or one year, depending on the exemption). He accordingly did not need to register his holdings, and he could sell immediately upon conversion without a further waiting period.

Almagarby's goal was to conduct transactions rapidly and at high volumes. He did little to no research on the issuers of the shares he acquired because his goal was "to turn [his] money around as fast as possible." He testified that he would "try [to] be in and out of it as soon as possible" and that his "idea wasn't to hold on." Soon after purchasing or negotiating an exchange agreement for any convertible debt instrument, Almagarby would send a conversion notice to the issuer; he converted most instruments within 10 trading days of receiving them. The issuer would arrange for its transfer agent to deposit the requested shares into one of Almagarby's six or more brokerage accounts. Almagarby would then immediately instruct his broker to sell the shares—ordinarily, within 7 to 14 days of receipt.

The quick turnarounds paid off. From January 2013 to July 2016, Almagarby made over $885,000 in net profits. He purchased over $1.1 million worth of outstanding aged debt and received over $2.8 million in proceeds from stock sales, which he used to fund further transactions. Almagarby engaged in at least 57 purchases of aged debt, from the debtholders of 38 issuers. He received deposits in his brokerage accounts on at least 167 occasions totaling around 8.5 billion shares, and he made at least 962 individual stock sales totaling over 7.6 billion shares.

Almagarby never had any employees. He instead entered into formal and informal agreements with "finders" who provided him with referrals. These finders were essentially telemarketers who located debt instruments available for purchase or cold-called

issuers with outstanding aged debt who might be willing to enter into convertible debenture agreements. Finders were a "large part of [Almagarby's] business," and his most significant finder employed several subcontractor telemarketers, each of whom cold-called 40 to 60 companies a day pursuing referrals. Almagarby told another investor that his finders were "a sales force" and that they "ha[d] been cold calling companies and bringing deals in consistently." He compensated his finders with a percentage of the amount that he paid for debt acquired from a referral but did not pay them any of the proceeds from stock sales.

Almagarby also retained counsel. He engaged at least 10 attorneys to provide opinion letters attesting that the shares he obtained from converting aged debt were exempt from the registration requirements of the Securities Act under Rule 144. He also relied on attorneys to draft the other documents necessary for his transactions, including debt purchase agreements, exchange agreements, convertible debentures, conversion notices, and reset notices. In an email to another investor, Almagarby explained that counsel were a part of his "loyal team."

But apart from finders and attorneys, Almagarby operated independently. He did not provide professional investment services or engage in most of the conduct described in the public guidance for defining broker-dealers. See *Guide to Broker-Dealer Registration*, U.S. SEC. & EXCH. COMM'N (last modified Dec. 12, 2016), https://perma.cc/YN2X-TZED. Almagarby never advertised or publicly held himself out as a buyer or seller of securities; never

took on clients, provided investment advice, or invested money other than his own; never attended investment conferences or meetings with issuer representatives; never promoted or solicited any other investor to invest in the securities of any issuer; never extended credit, or issued or originated securities; and never loaned securities, conducted repurchase transactions, or guaranteed or indemnified any other party.

In November 2017, the Commission filed a complaint against Almagarby as part of a broader crackdown against toxic lenders. Predatory microcap lending has proliferated over the past decade amid rising interest rates and greater capital constraints. In response, the Commission filed several enforcement actions alleging that the lenders are "dealers" required to register under the Exchange Act, 15 U.S.C. § 78o(a)(1). *See, e.g.*, *SEC v. Keener*, 580 F. Supp. 3d 1272 (S.D. Fla. 2022); *SEC v. Fierro*, No. CV 20-02104 (GC), 2023 WL 4249011 (D.N.J. June 29, 2023); *SEC v. Carebourn Cap., L.P.*, No. 21-cv-2114, 2023 WL 6296032 (D. Minn. Sept. 27, 2023).

In Almagarby's case, the district court granted summary judgment for the Commission. It ruled that Almagarby, as the "controlling person" liable for Microcap, 15 U.S.C. § 78t(a), operated as an unregistered dealer because he was "in the business of" buying and selling securities, *id.* § 78c(a)(5)(A). It relied on our decision in *Securities & Exchange Commission v. Big Apple Consulting USA, Inc.* to conclude that the quick turnaround and sheer volume of Almagarby's sales proved that he was in the securities "business." *See* 783 F.3d 786 (11th Cir. 2015). The district court then

adopted the magistrate judge's report and recommendation on remedies. It ordered Almagarby to disgorge $885,126.30 in total net profits and $182,150.69 in prejudgment interest, for a total of $1,067,276.99. It also permanently enjoined him from selling unregistered securities and from any future participation in penny-stock offerings.

After Almagarby filed this appeal, two sets of amici curiae filed briefs in support of Almagarby. First, Trading and Markets Project, Inc., an industry group representing public and private funds, investment advisors, and others, filed a brief and participated in oral argument as amicus curiae on behalf of Almagarby. Second, the Small Public Company Coalition, Alternative Investment Management Association, and National Association of Private Fund Managers filed an amicus brief.

## II. STANDARDS OF REVIEW

We review *de novo* a summary judgment. *Sutton v. Wal-Mart Stores E., LP*, 64 F.4th 1166, 1168 (11th Cir. 2023). We review *de novo* the interpretation of a federal statute. *Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*, 548 F.3d 986, 990 (11th Cir. 2008). We review for abuse of discretion an order of disgorgement and an injunction. *SEC v. Calvo*, 378 F.3d 1211, 1216–17 (11th Cir. 2004).

## III. DISCUSSION

We proceed in four parts. First, we explain that Almagarby operated as an unregistered securities dealer. Second, we explain that this enforcement action does not violate Almagarby's right to due process. Third, we explain that the district court did not abuse

its discretion by ordering disgorgement. Fourth, we explain that the district court did not abuse its discretion by enjoining Almagarby from future violations of section 15(a) of the Exchange Act, though it abused its discretion in enjoining Almagarby's participation in future penny-stock offerings.

### A. Almagarby Operated as an Unregistered "Dealer" in Violation of the Exchange Act.

Section 15(a) of the Exchange Act makes it unlawful for an unregistered "dealer" to use interstate commerce to "effect any transactions in . . . any security." 15 U.S.C. § 78o(a)(1). A "dealer" must register with the Commission. *See id.* Registration is one of the primary enforcement mechanisms of the Exchange Act, and it obligates dealers to provide regulators with adequate information for oversight. *See Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968). Unregistered dealers are prohibited from buying and selling securities in interstate commerce. *See* 15 U.S.C. § 78o(a)(1).

Section 3(a)(5)(A) of the Exchange Act defines a "dealer" as "any person engaged *in the business* of buying and selling securities . . . for such person's own account." *Id.* § 78c(a)(5)(A) (emphasis added). In colloquial terms, a "dealer" is a professional market-maker who matches the buyers and sellers of securities. *See What Is a Broker-Dealer?*, U.S. Sec. & Exch. Comm'n, https://perma.cc/ABH6-AEUC (last visited Jan. 3, 2024). Typically, dealers profit from trade *execution*, either by charging clients or counterparties a commission or by capturing bid-ask spreads. In

other words, a dealer's business model depends on his *volume* of buying and selling because he profits from executing trades—that is why he is *"in the business* of buying and selling securities,"* 15 U.S.C. § 78c(a)(5)(A) (emphasis added).

Notably, the definition of "dealer" in the Exchange Act contains a carveout commonly called the "trader" exemption. Section 3(a)(5)(B) provides that a "dealer" does not include a person—a trader—who transacts in securities "but not as a part of a regular business." *Id.* § 78c(a)(5)(B). A trader is often understood as a "private investor," who profits from the "appreciation in the value" of his investment portfolio instead of from trade execution. *See In re Sodorff*, 50 S.E.C. 1249, 1992 WL 224082, at *5 & n.27 (Sept. 2, 1992). Because a trader can make lucrative profits from a few good investments, his business does not necessarily depend on high transaction volumes. The section 3(a)(5)(B) carveout reflects a historical difference between the functions of dealers and traders: a dealer provided market liquidity, and a trader managed pools of money and took investment positions based on views about asset valuation.

Although the distinction between dealers and traders remains crucial for regulatory purposes, dealers' and traders' functions have somewhat converged. Today, high-frequency and algorithmic traders represent most of the trading volume in public market equities. *See* Mary Jo White, *Enhancing Our Equity Market Structure*, U.S. SEC. & EXCH. COMM'N (June 5, 2014), https://perma.cc/H5L7-PK2P. Providing market liquidity is itself

a trading strategy, a fact that makes line-drawing between dealers and traders difficult. But the line remains legally significant because unregistered dealers are prohibited from interstate securities transactions and unregistered traders are not. *See* 15 U.S.C. § 78o(a)(1).

The Commission maintains that Almagarby was a "dealer" under the Exchange Act due to both the *kind* and the *amount* of his transaction activity. Specifically, the Commission argues that buying convertible debt for the purpose of immediate conversion and resale, and underwriting microcap share issues are activities characteristic of dealers. The Commission argues that the volume and regularity of Almagarby's transactions, and the fact that his *entire* business was predicated on flipping penny stocks, preclude him from qualifying for the trader exemption. We agree.

Almagarby engaged in the kind of activity characteristic of securities dealers. A "dealer" is "one who buys to sell—not one who buys to keep, or makes to sell." *Dealer*, BLACK'S LAW DICTIONARY (3d ed. 1933). Our precedents confirm that acquiring stock for the purpose of immediate resale is evidence of dealer activity. In *Eastside Church*, our predecessor court held that a purchaser of church bonds was a "dealer" under the Exchange Act because it acquired those assets "at a discount," for "its own account as a part of its regular business," and "sold some of them." 391 F.2d at 360–61. And in *Big Apple*, we held that the defendant was a dealer and underwriter because its entire business model involved purchasing "stocks at deep discounts" and "s[elling] those stocks for profit." 783 F.3d at 810; *see also Sodorff*, 1992 WL 224082, at *5 ("Unlike an

investor or trader," a dealer's "profits d[o] not result from appreciation in the value of the securities.").

This kind of stock-flipping is precisely what Almagarby did: he acquired the shares of microcap companies by converting debt at a discount, and then immediately resold the shares he obtained for a profit. He testified that his goal was to turn his "money around as fast as possible" and that he sold most of his holdings within days or weeks of receipt. And he explained that his "business model made money" by "buying the stock at a discount, selling it at market[,] and the difference [was] the profit." Unlike a trader or private investor, Almagarby did little to no research, had no longer-term views on the value of his holdings, and was not interested in taking on price risk. *See Sodorff*, 1992 WL 224082, at *5. Instead, he relied on high volumes of trade execution to profit.

That Almagarby brought *new* shares to the market is further evidence that he operated as a dealer. The process of acquiring new shares from an issuer "for the purpose of reselling them" is called "underwriting." *See Big Apple*, 783 F.3d at 807. Underwriting activity weighs in favor of the finding that an entity is a dealer. *See, e.g.*, *Definition of Terms in and Specific Exemptions for Banks*, Exchange Act Release No. 34-47364, 68 Fed. Reg. 8686, 8688 (Feb. 24, 2003) ("[D]ealers normally . . . participate in the sale or distribution of new issues."); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853, 859 (N.D. Ill. 2019) (finding it "particularly significant" that, "like an underwriter," the defendant "purchased stocks at a discounted price directly from numerous issuers . . . [and] quickly res[old] at a

marked-up price"); *Keener*, 580 F. Supp. 3d at 1287–88 ("As further evidence that [d]efendant meets the statutory 'dealer' definition, [d]efendant acquired newly issued stock directly from microcap issuers at a discount . . . and then resold the stock into the public market."). By converting aged debt, Almagarby created new securities and was responsible for the proliferation of issuers' shares in the market. His conduct more than doubled the share count of at least five of the issuers with which he transacted.

Almagarby argues that because he never purchased aged debt directly from issuers, he is not bound by any precedent that describes underwriting as the purchase of new securities "from" issuers. But he cannot evade our precedents based on a technicality. Under the Exchange Act, the "terms 'buy' and 'purchase' each include any contract to buy, purchase, or *otherwise acquire*" securities. 15 U.S.C. § 78c(a)(13) (emphasis added); *see also Pittsburgh Terminal Corp. v. Balt. & Ohio R.R. Co.*, 680 F.2d 933, 940 (3d Cir. 1982) (finding that "the conversion option in a convertible debenture qualifies as a contract for the purchase or sale of a security"). By sending conversion notices to issuers and triggering the creation of new shares that he then distributed, Almagarby behaved like an underwriter. *See Big Apple*, 783 F.3d at 807 (finding that defendants engaged in underwriting activity when they did not acquire securities with "an investment purpose" but "for the purpose of reselling them . . . with a view to distribution").

The volume and regularity of Almagarby's transactions support the ruling that he was "in the business" of buying and selling

securities. *See* 15 U.S.C. § 78c(a)(5)(A). The "centerpiece" of the Exchange Act's dealer definition is the word "business," which is "a particular occupation or employment habitually engaged in for *livelihood* or *gain*." *Big Apple*, 783 F.3d at 809 (quoting BLACK'S LAW DICTIONARY (10th ed. 2009)). "While evidence of merely *some* profits from buying and selling securities may alone be inconclusive proof, the defendants' *entire* business model was predicated on the purchase and sale of securities." *Id.*; *see also SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (a dealer's "level of activity" made him "more than an active investor"); *Sodorff*, 1992 WL 224082, at *4 ("[T]he primary indicia in determining that a person has 'engaged in the business' within the meaning of the term 'dealer' is that the level of participation in purchasing and selling securities involves more than a few isolated transactions."); *Fierro*, 2023 WL 4249011, at *5; *Carebourn*, 2023 WL 6296032, at *9; *Keener*, 580 F. Supp. 3d at 1282.

Almagarby does not dispute that he engaged in high-volume resales of microcap shares. Over a three-year period, he received 167 stock deposits totaling around 8.5 billion shares of stock and made at least 962 individual sales totaling more than 7.6 billion shares. He engaged in the distribution of 38 different issuers' securities. And he made over $885,000 in net profits. Almagarby also operated a professional business with contractors: he retained a "network of deal finders" who "ha[d] been cold calling" companies and "bringing deals in consistently." Although these finders were not formally employed, Almagarby does not dispute that they solicited market participants on his behalf to find securities available

for his purchase. And flipping penny-stocks was Microcap's "sole source of funds." Like the dealer in *Big Apple*, Microcap's *entire* business model relied on buying and selling securities, and its only source of profit was purchasing aged debt and obtaining repayment in discounted shares. *See Big Apple*, 783 F.3d at 809. Microcap's profits were Almagarby's sole livelihood.

Almagarby argues that the district court erred by relying on *Big Apple* because that decision interpreted the meaning of "dealer" under the Securities Act, *see* 15 U.S.C. § 77b(a)(12), not the Exchange Act. To be sure, the definition of "dealer" under the Securities Act is broader because it contains no trader carveout. *See id.* § 78c(a)(5)(B). But *Big Apple* explains that the meaning of "dealer" is "very similar" under both Acts. 783 F.3d at 809 n.11. Although the *Big Apple* defendants forfeited their arguments against liability for violating the Exchange Act, we explained that such an argument would fail "as a matter of law for the same reasons as it fails under [the Securities Act]." *Id.* at 806. *Big Apple* reflects our understanding that the trader carveout is defined by the statutory text, which provides that the trader must not transact in securities "as a part of a regular business." 15 U.S.C. § 78c(a)(5)(B). As we have explained, Almagarby does not qualify for that carveout because he *did* buy and sell securities as part of his regular business.

Almagarby and amicus Trading and Markets Project also argue that the heavier regulatory burdens on Exchange Act "dealers" relative to Securities Act "dealers" support a narrow reading of the former term. Generally speaking, the Securities Act regulates the

registration of securities during initial public offerings, and the Exchange Act regulates the secondary market, where existing securities are traded between members of the public. *See Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433, 1437–38 (2023). Securities Act "dealers" must ensure that securities are initially registered, and Exchange Act "dealers" are subject to ongoing heightened regulatory burdens to protect the public. *Id.* For example, Exchange Act dealers must keep records of financial activity for the Commission's review, *see* 15 U.S.C. § 78q(a)(1), (b); 17 C.F.R. §§ 240.17a–3(a), 240.17a–4, and file regular reports of financial information, *see* 15 U.S.C. § 78q(e)(1)(A). They must also comply with costly customer-protection requirements—like antifraud provisions and capital and liquidity minimums, *see* 15 U.S.C. § 78o(c); 17 C.F.R. §§ 240.15c1–2, 240.15c3–3, 240.15c3–5, which amicus argues have no utility when applied to entities without customers. Indeed, amicus submits that an entity *must* execute trades on behalf of customers to be a "dealer" under the Exchange Act. But a customer requirement has no grounding in the statutory text; it is nowhere mentioned in the relevant portions of the Exchange Act. Instead, the Act considers whether an entity is transacting as a part of a "regular business." And multiple Exchange Act requirements do apply to a dealer "who does *not* carry customer accounts" "or hold funds or securities for . . . customers." 17 C.F.R. § 240.15c3–1(a)(2)(vi), (6)(ii) (emphasis added).

To be clear, we do not mean to suggest that *every* professional investor who buys and sell securities in high volumes is a "dealer." We acknowledge amicus's concern that an expansive

definition might sweep in all manner of market participants not traditionally understood as dealers, including investment advisors, mutual funds, pension funds, and other asset managers. But significant differences exist between Almagarby's conduct and that of amicus's investment advisor and fund members. For example, institutional asset managers do not rely on dilution financing or the rapid resale of microcap share issues as their sole source of income. Nor do they employ networks of finders to solicit microcap debtholders or operate without financial disclosures or regulatory oversight. Our holding that Almagarby operated as an unregistered "dealer" in violation of the Exchange Act is based on his specific conduct. And though Almagarby's underwriting activity is certainly relevant to this determination, it is not the only factor on which we rely.

### B. The Commission Did Not Violate Almagarby's Due-Process Right.

Almagarby argues that the Commission violated his Fifth Amendment right to due process by bringing an enforcement action under a novel interpretation of the term "dealer" that contradicts longstanding agency guidance and policy. He protests that the activity that allegedly rendered him a "dealer" is not described in the Broker-Dealer Guide or in no-action letters. *See, e.g.*, *supra*, *Guide to Broker-Dealer Registration*; *Acqua Wellington N. Am. Equities Fund, Ltd.*, SEC Staff No-Action Letter, 2001 WL 1230266 (July 11, 2001). But we have never held that an agency violates a defendant's right to due process by bringing an enforcement action based on a

legal theory not advanced in noncomprehensive public manuals or party-specific letters.

Due process requires "fair notice of what was forbidden," especially when an agency action represents an "abrupt" change from longstanding formal policy. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012). An enforcement action may violate due process if the defendant does "not have fair notice of the agency's interpretation" of a law or statute, even if that interpretation is reasonable. *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1331 (D.C. Cir. 1995). The fair-notice principle applies to administrative actions, *see Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982), but it has been recognized in only a "very limited" set of cases, *Suburban Air Freight, Inc. v. Transp. Sec. Admin.*, 716 F.3d 679, 684 (D.C. Cir. 2013).

Almagarby argues that the Commission failed to give him fair notice by relying on a novel enforcement theory that contradicts longstanding agency guidance about who qualifies as a "dealer." But the Commission has never issued any guidance on whether toxic lending is "dealer" activity. And though Almagarby's conduct is not described in the public Broker-Dealer Guide, the Guide does not purport to be legally binding or exhaustive. *See River N. Equity*, 415 F. Supp. 3d at 858. The Guide warns that "it is not comprehensive" and that readers "may wish to consult a private lawyer who is familiar with the federal securities laws" to determine whether they are dealers. *See supra*, *Guide to Broker-Dealer Registration*, § 1. Similarly, the Commission no-action letters are

limited to the named individuals, and they disclaim being binding legal interpretations. *See, e.g.*, *Davenport Mgmt., Inc.*, SEC No-Action Letter, 1993 WL 120436, at *13 (Sept. 22, 1992) (stating that no-action letters are "staff positions regarding enforcement action only and do not purport to express any legal conclusions regarding the applicability of the statutory provisions of the federal securities laws"); *Fairfield Trading Corp.*, SEC No-Action Letter, 1988 WL 233618, at *2 (Dec. 10, 1987) (same). Moreover, the letters cited by Almagarby are fact-specific, and none are analogous to the specifics of his situation. And he could have applied for a letter of his own had he been concerned with compliance.

The Commission's complaint against Almagarby accords with our precedents interpreting the Exchange Act. For the reasons we have explained, Almagarby is a "dealer" under section 15(a) of the Act. He had notice that he might be subject to agency action, and the Commission did not violate his constitutional right to due process.

### C. Disgorgement was an Appropriate Remedy.

Almagarby argues that the district court abused its discretion by ordering disgorgement because the Commission's enforcement action was untimely; disgorgement was not "appropriate or necessary for the benefit of investors," 15 U.S.C. § 78u(d)(5); and there was no causal link between Almagarby's failure to register and the profits that he was ordered to disgorge. These arguments fail.

The Commission's action was timely. The Commission filed its complaint in November 2017 and alleged that Almagarby acted

as an unregistered dealer between January 2013 and July 2016. The action was governed by a five-year statute of limitations, 28 U.S.C. § 2462, and was timely under that provision. *See Kokesh v. SEC*, 137 S. Ct. 1635, 1638 (2017). During litigation, Congress passed the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 6501, 134 Stat. 4625, 4626 (2021), which provides that a disgorgement claim by the Commission may be brought until "5 years after the *latest date* of the violation that gives rise to the action or proceeding in which the Commission seeks the claim occurs." 15 U.S.C. § 78u(d)(8)(A)(i) (emphasis added). That Act applies to this case. *See* Pub. L. No. 116-283, § 6501(b) (applying the amendment "to any action or proceeding that is pending on . . . the date of enactment [January 1, 2021]"). Because the Commission filed suit within five years of Almagarby's latest culpable act, Almagarby's timeliness argument is meritless.

Disgorgement also accords with the requirement that an equitable remedy under the Act be "appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). The Supreme Court recently reiterated in *Liu v. Securities & Exchange Commission* that disgorgement sounds in equity and that stripping wrongdoers of ill-gotten profits is consistent with equitable practice. 140 S. Ct. 1936, 1943 (2020) (disgorgement is a "profit-based measure of unjust enrichment" (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51, cmt. a, p. 204 (Am. L. Inst. 2010))). But the Court clarified that disgorgement must "not exceed a wrongdoer's net profits" and must be "awarded for victims" to be permissible under section 78u(d)(5). *Id.* at 1940.

Almagarby argues that the district court violated *Liu*'s victim-benefit requirement by never explaining how "*anyone* was harmed" and by not identifying a "class of victims" or a "methodology to calculate losses." But the Commission *did* explain that it planned to distribute awards to counterparties who had purchased shares from Almagarby and were negatively affected by the price impact of his selling activity. A Commission expert attested that it was possible to track the counterparties to Almagarby's sales using the "Electronic Bluesheet System," which records trading data obtained from broker-dealers and clearing firms. The expert explained that "the vast majority of counter-parties to the relevant sales of shares by [Almagarby] can readily be identified."

Post-*Liu*, our sister circuits have held that the victim-benefit requirement is satisfied under similar conditions. *See, e.g.*, *SEC v. Blackburn*, 15 F.4th 676, 682 (5th Cir. 2021) (affirming disgorgement post-*Liu* when the "[the Commission] has already identified" the victim-recipients of the "money [that] the defendants [will] return"). Indeed, the Tenth Circuit has held that the Commission need not even link loss amounts to specific instances of investor harm to satisfy the requirements of section 78u(d)(5). *See SEC v. GenAudio Inc.*, 32 F.4th 902, 952–53 (10th Cir. 2022). When the Commission is able to identify investors who have suffered pecuniary harm, disgorgement satisfies the requirement that disgorgement be "for the benefit of investors." 15 U.S.C. § 78u(d)(5).

Finally, Almagarby's profits were causally linked to his failure to register. Section 15(a) prohibits unregistered dealers from

using interstate commerce "to effect *any transactions* in . . . any se-curity." *Id.* § 78o(a)(1) (emphasis added). Almagarby was alto-gether prohibited from making transactions as an unregistered dealer, so *any* profits generated from his prohibited transactions were causally linked to his failure to register. *See SEC v. Teo*, 746 F.3d 90, 103 (3d Cir. 2014) (providing that the Commission's civil enforcement actions need not show "proximate causation"); *see also SEC v. Apuzzo*, 689 F.3d 204, 212–13 (2d Cir. 2012).

The district court did not have to speculate about the profits of any lawful transactions that Almagarby *might* have made had he chosen to register as a dealer. *See Calvo*, 378 F.3d at 1217 ("[A]ny risk of uncertainty should fall on the wrongdoer whose illegal con-duct created that uncertainty." (citation and internal quotation marks omitted)). Indeed, had Almagarby registered, he likely would have faced significant restraints on his toxic lending activity. For example, dealers must comply with self-regulatory organiza-tions' rules, and the Commission asserts that Almagarby likely would have been limited by regulations such as the industry prohi-bition on "unfair or unreasonable" underwriting activity. *See* FINRA Rule 5110(c)(2)(A). So the district court did not abuse its discretion by ordering Almagarby to disgorge the profits causally linked to his failure to register.

*D.  The District Court Properly Enjoined Defendants from Future Exchange Act Violations but Abused its Discretion in Ordering a Penny-Stock Bar.*

Finally, Almagarby challenges the district court's injunction, both the portion prohibiting future unregistered securities transactions in violation of section 15(a)(1) of the Exchange Act and the portion prohibiting future participation in penny-stock offerings.

The Commission may obtain a permanent injunction if it shows "a prima facie case of previous violations of federal securities laws, and . . . a reasonable likelihood that the wrong will be repeated." *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004) (per curiam).  We assess the likelihood of a repeat violation by considering the following factors:

> [the] egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of the conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*Id.* (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982)) ("the *Blatt*[1] factors").  And "[w]hile scienter is an important

---

[1] Our predecessor Court identified these factors in *SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978).

factor in this analysis, it is not a prerequisite to injunctive relief." *Id.*

We begin with the district court's injunction prohibiting Defendants from engaging in future violations of section 15(a)(1) of the Exchange Act. In ordering this relief, the district court permanently enjoined Defendants from transacting in securities without registering as dealers or associating with a registered broker-dealer. The district court did not abuse its discretion in imposing this portion of the injunction.

To be sure, it is "not enough" to reason that "past misconduct gives rise to an inference of future misconduct." *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979). But Defendants' engagement in securities transactions without registering as "dealers" violated the Exchange Act at the time of the transactions, and repeating that conduct in the future would continue to violate the Exchange Act. In other words, even in the absence of an injunction barring Defendants from conducting future unregistered securities transactions in violation of the Exchange Act, the Exchange Act itself bars that conduct. Here, as the district court found, Defendants engaged in hundreds of unregistered transactions—all of which were unlawful at the time and continue to be so—and Microcap plus two of Almagarby's similar business entities remain listed as active. Under these circumstances, the district court did not abuse its discretion in enjoining Defendants from engaging in further violations of the law they already broke.

But we cannot say the same for the penny-stock bar. That bar prohibits both unlawful *and* lawful penny-stock transactions. The district court permanently enjoined Defendants from future participation in all penny-stock offerings based on its conclusion that "absent an injunction, there is little to stop Defendants from resuming their unlawful activity." *SEC v. Almagarby*, 479 F. Supp. 3d 1266, 1274 (S.D. Fla. 2020). In reaching that result, though, the district court abused its discretion in its treatment of the *Blatt* factors.

We have already acknowledged that *Blatt*'s "recurrence" factor supports an injunction here. We also recognize that while Almagarby is currently employed in the home-repair business, his maintenance of Microcap and two similar companies as active business entities would allow him the opportunity for future securities-law violations with respect to penny stocks, if he chose to engage in that misconduct. But on this record, none of the other factors weigh in favor of an injunction. The district court's finding otherwise was an abuse of discretion.

We begin with scienter, which we have characterized as "an important factor in this analysis." *Calvo*, 378 F.3d at 1216; *see also Aaron v. SEC*, 446 U.S. 680, 701 (1980) (reasoning that, when deciding whether to enjoin a defendant, the district court should consider the "degree of intentional wrongdoing evident in a defendant's past conduct," including "scienter or lack of it"). It is undisputed that section 15(a) of the Exchange Act does not contain a scienter element. *See* 15 U.S.C. § 78o(a). And neither the district court nor the partial dissent attributes scienter to Defendants.

Indeed, Almagarby's actions cannot fairly be characterized as involving scienter, especially given that he consulted numerous attorneys and appeared to at least try to follow the law.[2]  Without any "degree of intentional wrongdoing," this factor counsels against an injunction.  *See Aaron*, 446 U.S. at 701.

Next, we consider the sincerity of Defendants' assurances against future securities-law violations.  *See Carriba Air*, 681 F.2d at 1322.  In his remedy-phase affidavit, Almagarby attested that he would "respect the Court's ruling," "appreciate[s] the importance of the securities laws," and would "never again place [himself] in a position where [he would] be acting as a dealer, unless [he became] registered."  The record provides no reason to question the

---

[2] The partial dissent characterizes this statement as "optimistic," contending that Almagarby consulted attorneys only to "immunize" himself from liability for violating Securities Act reporting requirements through the Rule 144 safe harbor.  Dissent at 2–3.  The partial dissent cites nothing in the record for its conclusion, and it would make little sense for Almagarby to seek counsel's advice on registration requirements under the Securities Act and not the Exchange Act.  Nor do we think it fair to characterize Almagarby as having retained counsel to "circumvent" the Securities Act's registration requirements.  Dissent at 6.  The record suggests Almagarby retained counsel to ensure his compliance with an express and often-invoked regulatory exception.  Invoking the Rule 144 exception—which exempts certain transactions from registration and certain sellers from "underwriter" status, *see* 17 CFR § 230.144—is not the same as "circumvent[ing]" the securities laws.  To be sure, one can consult counsel and still violate the securities laws, but at the very least, Almagarby's retention of counsel here reflects some effort to comply with the securities laws rather than a willful or reckless violation.

21-13755                Opinion of the Court                27

sincerity of these assertions.[3]  The partial dissent speculates that "the district court implicitly found wanting Almagarby's sincerity in disavowing future misconduct." Dissent at 3.  But that requires an inferential leap from either the district court's initial opinion or the magistrate judge's report and recommendation, neither of which expressly addressed the sincerity factor.  And while we do not reweigh credibility determinations on appeal, neither do we invent them.

The next factor, recognition of the wrongful nature of the conduct, likewise does not weigh in favor of an injunction here.  The partial dissent asserts that "Almagarby continues to deny that he violated any securities laws" and "refus[es] to recognize wrongdoing." Dissent at 3.  But the partial dissent bases its argument solely on the fact that Almagarby maintains on appeal that he was not required to register as a "dealer" under section 15(a)(1) of the Exchange Act.  So the partial dissent penalizes Almagarby for appealing.  Yet making a non-frivolous argument on appeal is not the same thing as refusing to accept and respect the law once it has been settled.    If  Almagarby's  arguments  were  patently

---

[3] The partial dissent states that "[a] defendant's 'assertions . . . that he would cease his wrongful conduct are by no means dispositive[.]'" Dissent at 3 (quoting *Carriba Air*, 681 F.2d at 1322).  We agree.  But we don't suggest the contrary.  Rather, under our precedent, sincerity of reassurances against future violations is one factor relevant to the propriety of an injunction, *Carriba Air*, 681 F.2d at 1322, and this record provides no reason to question Almagarby's sincerity here.  So while not "dispositive," this factor certainly does not *compel* an injunction, especially not one based on nothing more than speculation as to sincerity.

unreasonable or clearly contrary to law, or if he lacked candor before the Court, this could be a different case. But that is not a fair description of the proceedings here.

We conclude with the "egregiousness" factor. The district court acknowledged the Commission's "argu[ment] that Defendants' conduct qualifies as egregious because it spanned over three years and thousands of transactions." But this collapses the "egregiousness" determination into the recurrence factor. What's more, Defendants' conduct is markedly distinguishable from other cases in which we have found "egregious" conduct.

Our caselaw does not expressly define "egregiousness" in this context.[4] But the common meaning of "egregious" is "[e]xtremely or remarkably bad; flagrant <the defendant's egregious behavior>." *Egregious,* BLACK'S LAW DICTIONARY (11th ed.

---

[4] The partial dissent claims that "conduct is egregious when a defendant exhibits 'a pattern of past and present questionable business practices.'" Dissent at 1–2 (quoting *Carriba Air*, 681 F.2d at 1322). But the partial dissent bases this assertion solely on *Carriba Air*. And even the most cursory review of that case reveals it never defined "egregiousness." Rather, *Carriba Air*'s discussion reflects that we found the combination of the following facts to qualify as "egregious": "The SEC had demonstrated a pattern of past and present questionable business practices. Blatant and inexcusable violations of the securities laws occurred. The [defendants] knowingly made material misrepresentations and at least recklessly made material omissions on documents submitted to the SEC. The [defendants] took no action to correct these misrepresentations and omissions. Indeed, the public offer was withdrawn only after the SEC launched its investigation. It is further likely that the [defendants] will remain in a position where opportunities for future violations of the securities laws will be abundant." *Id.*

2019). And our securities precedent affirming injunctions confirms that that's precisely the definition of "egregious" we had in mind when, in *Blatt*, we referred to the "egregiousness of the defendant's actions." 583 F.2d at 1334 n.29. We therefore review that precedent here.

We begin with *Carriba Air*. There, the defendants distributed a false and misleading prospectus, which they used to sell shares to the public. *See Carriba Air*, 681 F.2d at 1321. We said that, among other conduct, they had engaged in "[b]latant and inexcusable violations of the securities laws," that they "knowingly made material misrepresentations and at least recklessly made material omissions on documents submitted to the SEC," and that they withdrew their public offering "only after the SEC launched its investigation." *Id*. at 1322. And only after noting that the *Blatt* factors were "virtually all present in the . . . case" did we opine that "the trial judge could properly have concluded that absent an injunction there was a reasonable likelihood of securities law violations in the future despite the mea culpas and protestations of reformation on the part of the [defendants]." *Id*.

From *Carriba Air*, we discern several facts indicating egregiousness: (1) "blatant" securities-law violations, (2) knowingly or recklessly making material representations or omissions (fraud), and (3) scienter. *See id*. None of these facts are present here.

First, this record does not allow us to characterize Defendants' failure to register as "blatant." Rather, though we ultimately reject it, Defendants put forward a non-frivolous argument that

they were not required to register as "dealers" under the Exchange Act.

Second, Defendants' conduct involved no false statements, misrepresentations, or material omissions. And unlike securities fraud, which is never lawful, had Defendants been registered as dealers, their conduct would not have violated the law. To be sure, it's unlikely that, as a registered dealer, Almagarby would have involved himself in the same activity. But the point is that, unlike the defendants' acts in *Carriba Air*, Almagarby's underlying securities deals, in and of themselves, were not unlawful. Nor, as we've discussed, did Defendants' violations involve scienter.

So none of the facts that reflected egregiousness in *Carriba Air* are present here.

The same is true with respect to other cases in which we've found egregiousness. In *SEC v. Ginsburg*, 362 F.3d 1292, 1295 (11th Cir. 2004), the defendant CEO was found liable for insider trading after repeatedly providing material nonpublic information to family members, who then traded on the information. In other words, he "breached his fiduciary duty to his company and shareholders . . . for the financial gain of his family members." *Id.* at 1304. We said the defendant's conduct of "[d]eliberately tipping material nonpublic information for family members' financial gain is a bad thing, and doing it twice in a year is doubly so." *Id.* Indeed, we described the defendant's behavior as "knowing and intentional misconduct." *Id.* at 1304–05. And as in *Carriba Air*, we said that "every one of the factors to be considered weigh[ed] in favor of

enjoining [the defendant]." *Id.* at 1304. As a result, we explained, the district court's failure to enjoin the defendant in *Ginsburg* was an abuse of discretion. *Id.*

*Ginsburg* emphasizes the intentionally dishonest nature of the conduct that we've found is egregious. *Ginsburg* involved (1) the CEO defendant's breach of his fiduciary duty to his own company and shareholders to their detriment, to enrich his family members, and (2) scienter. But the facts here satisfy neither of these conditions. So *Ginsburg* does not support a finding of egregiousness here.

Finally, in *Calvo*, we found egregiousness when the defendant engaged in a fraudulent "pump and dump" scheme. 378 F.3d at 1213. That "recidivist" defendant had previously been found liable for securities fraud and enjoined from future violations. *Id.* at 1216. Yet he remained in the investment business, even employing "a convicted felon with past securit[ies] law violations." *Id.* So on the list of factors supporting egregiousness, we note again (1) fraudulent conduct and (2) scienter, and we add (3) past adjudicated securities violations, and (4) the knowing employment in the operation of a convicted felon with past securities violations. As with *Carriba Air* and *Ginsburg*, Defendants do not qualify for a finding of egregiousness under any of these factors.

To the contrary, as we explained in *Ginsburg*, "[i]t is this type of intentional, knowing conduct [at issue in *Carriba Air*, *Calvo*, and *Ginsburg*], **as opposed to more minor, technical violations**, for which injunctions are reserved." *Id.* at 1305 (emphasis added); *see also SEC*

*v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992) ("Injunctive relief is reserved for willful lawbreakers or those whose operations are so extremely or persistently sloppy as to pose a continuing danger to the investing public.").

Exactly. Defendants' acts, though wrong, did not come close to the misconduct of the *Carriba Air*, *Ginsburg*, or *Calvo* defendants. While those defendants engaged in "intentional, knowing conduct" involving fraud and scienter, Defendants' violations were "more minor, technical violations" without fraud or scienter. *See Ginsburg*, 362 F.3d at 1305. So our precedent does not support a finding of egregiousness here.

The partial dissent would affirm on the same ground as the district court imposed the injunction, asserting that "[w]e routinely affirm when voluntary cessation is the only impediment to an offender's recidivism." Dissent at 3. In support of this proposition, both the district court and partial dissent rely on *Carriba Air* and *Ginsburg*. But for the reasons we have explained, *Carriba Air* and *Ginsburg* cannot bear that weight. And were the uncertainty of voluntary cessation dispositive, *Carriba Air*'s multi-factor framework—which we've employed for nearly fifty years—would be meaningless.

Instead, the district court was required to consider each of the *Blatt* factors and order a permanent injunction only if the balance of those factors supported an injunction. To be sure, the district court nominally "applied the correct legal standard." *See Ginsburg*, 362 F.3d at 1305. But since we identified the *Blatt* factors more

than forty years ago, we have not, to the best of our knowledge, approved of enjoining a defendant from participating in otherwise-lawful behavior when that defendant had not already exhibited his unlikeliness to comply with the law going forward—either through prior adjudicated securities violations or through conduct bordering on (if not amounting to) criminal.

Contrary to the partial dissent's contentions, our recognition of this fact does not somehow create a "new test" for when a district court may enjoin a defendant from engaging in otherwise-lawful conduct.  Rather, it simply applies more than forty years of our precedent using the *Blatt* factors to determine when such an injunction may be appropriate.  Indeed, no Circuit precedent we're aware of—including the only cases the district court cited in support of its penny-stock bar—supports the enjoining of otherwise-lawful behavior under the circumstances here.

In short, although the district court otherwise did an admirable job sorting through the issues in this case, it "made a clear error of judgment in the result it reached applying that standard." *See Ginsburg*, 362 F.3d at 1305.  We acknowledge that "the burden of showing that the trial court abused its discretion is necessarily a heavy one," *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980), but it is not an insurmountable one.  So we conclude that the district court abused its discretion in ordering the penny-stock bar. We vacate that portion of the injunction, though we affirm the portion enjoining future Exchange Act violations.

## IV. CONCLUSION

We **AFFIRM IN PART** and **REVERSE IN PART** the judgment for the Commission.

21-13755      WILLIAM PRYOR, C.J., Dissenting in part      1

WILLIAM PRYOR, Chief Judge, dissenting in part:

My colleagues and I agree that the Commission had the authority to prosecute Almagarby for securities law violations and that the district court properly ordered him to disgorge over $885,000 in ill-gotten gains. I write separately because I would also affirm the penny-stock ban, which is aimed squarely at curtailing the kind of egregious conduct for which Almagarby has been found liable. The district court did not abuse its discretion when, after recognizing Almagarby's extensive illegal participation in penny-stock offerings, it enjoined him from future participation in such offerings.

The Commission is entitled to a permanent injunction when it establishes "a prima facie case of previous violations of federal securities laws" and "a reasonable likelihood that the wrong will be repeated." *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004). The "reasonable likelihood" of reoccurrence is the touchstone of the inquiry, which considers the following factors:

> [the] egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of the conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*Id.* (internal quotation marks omitted) (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982)). Conduct is egregious

when a defendant exhibits "a pattern of past and present questionable business practices." *Carriba Air*, 681 F.2d at 1322. Although scienter—that is, a defendant's awareness that his egregious conduct violates the law—is an important factor, it is not a prerequisite to injunctive relief. *Calvo*, 378 F.3d at 1216.

The grant or denial of injunctive relief "rests within the sound discretion of the trial court and will not be disturbed unless there has been a clear abuse of it." *SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978) (citation and internal quotation marks omitted). And "the burden of showing that the trial court abused its discretion is necessarily a heavy one." *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980). Although it cites our precedents, the majority nevertheless invents a new test that requires an injunction to either (1) be a preceded by a "prior adjudicated securities violations" or (2) involve "conduct bordering on (if not amounting to) criminal." Maj. Op. 32. But that test is *not* the legal standard articulated in our precedents and against which we must evaluate an abuse of discretion. To be sure, our precedents have affirmed injunctions where the majority's factors are present, but we have never held that those factors comprise the universe of circumstances where an injunction is warranted.

The district court's tailored injunction was not an abuse of discretion. It correctly applied our precedents. And it considered the full range of relevant factual predicates: the district court ordered the penny-stock ban only after it "reviewed" and expressly "adopted" the magistrate judge's report, which it found "to be

21-13755    WILLIAM PRYOR, C.J., Dissenting in part    3

clear, cogent, and compelling." *SEC v. Almagarby*, No. 17-62255-CIV, 2022 WL 832279, at *1 (S.D. Fla. Feb. 15, 2022). That report recognized that Almagarby's "conduct qualifies as egregious"; that his "violations spanned multiple transactions over a three-year period generating $2,601,383.09 from the sale of shares"; that he "has two other business entities like [Microcap] that remain active"; that his youth supports an inference of recidivism; and that "nothing will prevent [Almagarby] from returning to the violations other than . . . voluntary cessation." These considerations speak to the full panoply of factors relevant to an injunction.

The majority would have us take at face value Almagarby's reassurances against future securities-law violations and his promise to "never again" operate as an unlicensed securities dealer. Maj. Op. 26. But we have explained that a trial judge may "properly [] conclude[] that absent an injunction there [is] a reasonable likelihood of securities law violations in the future," even if a defendant promises to stop. *Carriba Air*, 681 F.2d at 1322. A defendant's "assertions . . . that he would cease his wrongful conduct are by no means dispositive," and for good reason. *Id.* (citing *Mitchell v. Pidcock*, 299 F.2d 281, 286–87 (5th Cir. 1962)); *see also SEC v. Ginsburg*, 362 F.3d 1292, 1305 (11th Cir. 2004). Were we to credit the "*mea culpas* and protestations of reformation" of every liable defendant, it would be the rare instance in which we could affirm an injunction. *Carriba Air*, 681 F.2d at 1322. In imposing the penny-stock ban, the district court implicitly found wanting Almagarby's sincerity in disavowing future misconduct. And we must "give weight to the

trial court's opportunity to judge the credibility" of Almagarby's assurances that he will not recidivate. *Id.* at 1323.

Almagarby also continues to deny any misconduct. Nowhere in the record does he acknowledge the illegality of his activity or that his toxic lending was a "questionable business practice[]." *See id.* at 1322. His refusal to accept responsibility is not encouraging, nor is his tepid reassurance on appeal that his past illegal conduct "doesn't mean [he] will repeat the conduct in question." Almagarby's refusal to recognize wrongdoing weighs in favor of the need for injunctive relief to restrain future wrongdoing. *Ginsburg*, 362 F.3d at 1305 ("Promising to stop doing wrong while denying any wrongdoing is the wrong way to establish that wrongdoing will not reoccur."); *SEC v. MacElvain*, 417 F.2d 1134, 1137 (5th Cir. 1969) (that violators "maintained and continue to contend" that their illegal securities offering "d[id] not involve a 'security'" weighed in favor of a permanent injunction).

Nor does the record support the majority's optimistic interpretation that Almagarby "consulted numerous attorneys" in an attempt to "follow the law." Maj. Op. 26. Indeed, Almagarby admits that he engaged "no fewer than ten attorneys" to "provide Rule 144 Opinion Letters"—that is, letters advising that Almagarby was exempt from the Commission's Rule 144 reporting requirements, for which he has not been prosecuted. But those letters may reflect only Almagarby's desire to *immunize* himself from liability, as much as any desire to follow the law. *Cf.* James J. Fuld, *Legal Opinions in Business Transactions—An Attempt to Bring Some Order out of Some*

21-13755      WILLIAM PRYOR, C.J., Dissenting in part            5

*Chaos*, 28 BUS. LAW. 915, 918 (1973). Almagarby retained counsel to obtain legal documents that corroborated his *exemption* from the Commission's regulation and reporting requirements. We have recognized that "continual[] attempt[s] to *circumvent* the registration requirements [of the Securities Act] rather than comply with them" suggests a greater need for injunctive relief. *MacElvain*, 417 F.2d at 1137 (emphasis added).

As the district court recognized, Almagarby engaged in the practice of toxic lending over the course of years. He illegally sold over $2 million of securities and has never admitted any wrongdoing. And he still maintains two active business entities that he formed to trade penny stocks. *See Ginsburg*, 362 F.3d at 1305 (defendant's board position would offer "future opportunities to violate the securities laws"); *Calvo*, 378 F.3d at 1216 (defendant's "current occupation—which is investment-related—presents opportunities for future securities violations"). Voluntary cessation is the only impediment to Almagarby's recidivism. I cannot agree that the penny-stock ban was an abuse of discretion under these circumstances. I respectfully dissent as to Part III-D.